Filed 5/06/13  Raygoza v. Trejo CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

OMAR RAYGOZA,

    Plaintiff and Respondent,

       v.

YVETTE R. TREJO,

    Defendant and Appellant.

G046855

(Super. Ct. No. 06FL000812)

O P I N I O N

       Appeal from an order of the Superior Court of Orange County, Richard G. Vogl, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

       Julie A. Ringquist for Defendant and Appellant.

       Omar Raygoza, in pro. per., for Plaintiff and Respondent.

           *         *         *

Yvette Trejo appeals from the trial court's order altering the custody and visitation arrangements for her six-year-old daughter, B., in favor of B.'s father, Omar Raygoza. Trejo contends the trial court erred by taking judicial notice of its own records without specifying which, if any, of those records it relied upon for its ruling. She also challenges the sufficiency of the evidence to support the court's conclusion a change in circumstances justified revisiting the existing custody and visitation arrangement and whether the court's new order was in B.'s best interests. Given the deferential abuse of discretion standard, we affirm the trial court's order.

I

FACTUAL AND PROCEDURAL BACKGROUND

Raygoza and Trejo never married, but had a 13-year relationship that produced a son in the early 1990's, Omar, Jr., and after a separation and brief reconciliation, a daughter in late 2005, B. Trejo did not list Raygoza as the father on B.'s birth certificate. In June 2006, he sought a court order establishing his paternity. Just before B.'s first birthday in September, the parties reached a parenting agreement in mediation, and in October the court confirmed Raygoza's paternity. Based on the parenting agreement, the trial court issued an order granting Raygoza and Trejo joint legal custody of B. and sole physical custody to Trejo, with visitation for Raygoza on Tuesday and Thursday afternoons and more time as B. grew older, including overnight visits on alternating weekends.

The court explained in a later order that physical custody simply referred to which parent had "physical control over the child and those decisions attendant to such immediate control" when the child was with that parent. And "[l]egal custody refers to the authority and duty to make long-range decisions concerning a child's life, including

2

education, discipline, medical care and other matters of major significance to a child's life. Joint legal custody, therefore, refers to joint decision-making concerning long-range decisions." The court recognized "that, in theory at least, joint custody is preferable to sole custody because the children are able to sustain relationships with both parents."

The court cautioned, however: "Joint custody does not *necessarily* benefit children. . . . Research, conducted by the Center for the Family in Transition in Corte Madera, California, found that where parents separated amicably, there was no difference in the child's development whether in joint or single-parent custody. However, children whose parents had bitterly contested cases were more psychologically disturbed if courts imposed joint physical custody. These children were significantly more depressed, withdrawn, un-communicative, had more physical symptoms and tended to be more aggressive, the study found." (Italics added.) The court observed that "[j]oint custody arrangements *are* usually workable when the parties can cooperate and communicate so that each child's life is not seriously disrupted." (Original italics.) Trejo and Raygoza managed to coparent B. without court intervention, at least initially.

In February 2008, the parties returned to court and agreed in mediation to modify their custody and visitation arrangements. The record does not disclose the nature of the modification. Neither party on appeal provides the mediation agreement, nor any motion, response, or other documentation showing the context or reason for any changes made. Testimony later showed, however, that Trejo agreed in the February 2008 modification that her boyfriend John Morin, who was on probation for an unspecified offense, would not "be allowed" around B., who was now two and one-half years old.

In November 2009, the parties again appeared in court and again there is scant detail in the appellate record except the court's minute order, which provides:

"Both parties are sworn to testify. [¶] Plaintiff requests to modify current order to allow more visitation time and to change drop off location. [¶] Court reads confidential letter submitted by Mediation. [¶] Court inquires from parties about child protection services [CPS] being involved. [¶] Petitioner testifies. [¶] **Request to modify order is denied without prejudice.** [¶] Plaintiff is advised to get assistance from counsel on how to address this issue properly." (Original boldface.)

The trial court subsequently observed when Raygoza again appeared in propria persona, "Persons who are self-represented present challenges to court personnel. They often expect the court to assist them, not understanding the function of the judicial officer as an impartial arbiter, and so feel that the court is biased against them if the court does not help them present their case, or feels the court is biased against them if the court advises them [to] obtain an attorney. In family law cases, especially, where emotions often run high and can easily get out of hand, a self-representing party's problems are compounded by their not knowing applicable procedural and evidentiary rules. It must be clearly stated that the standards in court are no different for the self representing litigant." Nothing in the record, however, sheds light on the nature of CPS's involvement, if any, or other matters leading up to the November 2009 hearing. In any event, as noted, the court denied without prejudice Raygoza's modification request for more visitation.

The parties returned to court in 2011. Raygoza sought "sole" or "full" custody of B., who was now six years old. In a detailed October 2011 order, the trial court ordered a custody evaluation under Evidence Code section 730 (§ 730 report or evaluation) to be conducted by a therapist from the Family Assessment Counseling and Educational Services (FACES) program. The court reiterated that joint custody works

4

"when the parties can cooperate and communicate," but observed, "It would seem that the parties have not worked well together and that this court needs to make some inquiry as to what is in the best interests of the child." The court anticipated "frequent and continuing contact with each parent."

The court specified that the § 730 report "will be received as the court's own evidence," that it "may be adopted as the ultimate factual finding as to those issues reported upon," and "will be considered by the court at any future hearing . . . ." The court noted, however, that it was not bound by the evaluator's opinions, if any, "even if the opinion is uncontradicted." Instead, it remained the court's obligation to determine B.'s best interests. To aid the court, the parties remained free at the ensuing hearing "to examine or cross-examine the mental health professional" conducting the § 730 report, but "that party shall give notice to the expert and subpoena that person at their own expense and shall advance the fee for such testimony."

The court left in place the existing arrangements before the report was completed, specifically, Tuesday and Thursday afternoons and every other weekend from Friday until Sunday evening with Raygoza, and the remainder of the time with Trejo. This apparently had been the parties' arrangement for years, confirmed by earlier court orders. The court specified that "a change of circumstances shall be required to modify these" custody arrangements, but observed that "a breakdown in the co-parenting of the parties after these long years . . . would be a substantial change of circumstances" justifying modification.

The court also explicitly identified important criteria on which it would base its custody determination following the § 730 report. The court would not focus "[o]n the interest of either party," but instead: "The court is interested if either party does

5

more than the other to promote the child's relationships *with the other parent's family*, protects the child from unsafe family members or environments, or *sacrifices their own individual rights* to assure any child participates in important *family* passages." (Italics added.)

The court's order vacated the "earlier order whereby Johnny Mor[i]n is not to be in the presence of the child." The order also specified that the parent "who has physical care of B[.] at any given time shall have the routine decision-making rights and responsibilities during those periods of time," with the exception of "major" decisions "pertaining to medical, dental and *psychological* treatment and education which shall be made jointly by the parents." (Italics added.) The order required Trejo to confer with Raygoza "regarding all medical, psychiatric, biomedical intervention and diet, as well as therapeutic intervention decisions, and school decisions," but placed on Trejo "ultimate[] responsibility to make all such decisions . . . ." Each parent was entitled to undertake "emergency medical, psychological, [and] dental treatment . . . ." (Original underlining.)

On December 23, 2011, Raygoza filed an ex parte request for exclusive legal and physical custody of B. "until the 730 evaluation process has been completed" because of B.'s poor school behavior and grades. Raygoza visited B.'s classroom in December and found she had received five negative citations for poor behavior. According to Raygoza, B.'s teacher "expressed . . . concerns regarding her behavior . . . both in her classroom and on recess" and that B. was "falling behind in all subjects." Raygoza complained that although the teacher conveyed "these concerns to Ms. Trejo many times[,] no changes were made." B. had received four behavioral citations all year in kindergarten, but already in first grade exceeded that number in one trimester. B.'s conduct included destroying a teacher's property (an eraser cloth) and hitting a student in

the face with a book. Raygoza complained Trejo failed to inform him of B.'s poor progress in school, telling him only of a new citation B. received *after* his school visit.

Raygoza included with his motion B.'s fall progress report showing she was "at Risk of Retention" and her trimester report card showing "Below Basic" performance in Reading, Writing, and Spelling, with below satisfactory effort in "Complet[ing] Home Reading Assignments," "Observ[ing] Classroom and Playground Rules," and "Respect[ing] Rights and Property of Others." Trejo did not object to Raygoza's declaration or the documentary evidence he submitted to support his custody motion. Because neither party had been interviewed for the § 730 report yet, the trial court denied Raygoza's ex parte custody motion pending a hearing once the report was complete.

The trial court also denied an ex parte motion Trejo filed the same day as Raygoza, on December 23, 2011, in which she requested sole physical custody of B. and visitation for Raygoza only if he paid for a professional monitor, which she suggested he could not afford. Specifically, Trejo alleged B. told her that Raygoza videotaped B., his girlfriend, and his girlfriend's 12-year-old daughter dancing and the girlfriend began dancing in an inappropriate, suggestive manner, which Raygoza continued to videotape.

Because B. "may be irreparably harmed should the behaviors I describe above continue," which "constitute emotional abuse and may be a form of sexual abuse, [or] at best . . . show[ing] extremely bad judgment in parenting," Trejo requested "*that this court order an investigation of some sort*," but not one in which the parties bear the cost for a § 730 report because "*neither of us can afford a full 730 . . . .*" (Original italics.) Trejo added other concerns "about what is going on while B[.] is in Petitioner's care," including that he was "involving her in this case, making her uncertain that she

7

will still be seeing me, making her uncertain that I still want her, and possibly being told to misbehave and cause trouble in order to change custody. But mostly, I am concerned about the videotaping going on and want this matter investigated."

Trejo informed CPS of her allegations, but "CPS advised that this event should be reported to the Judge in our custody case." Raygoza denied in a responsive declaration the allegations as "Lies" that "Miss Trejo [br]ought up . . . after I w[]ent to go see her teacher and found out [about] her behavior and report card." Trejo did not bring up her dancing allegation as a concern for the § 730 evaluator, nor did she raise it in her testimony at the eventual court hearing. In any event, the court denied both Trejo's and Raygoza's ex parte custody motions.

The § 730 evaluation finally took place in mid-February 2012, and by that time it appears B. received additional poor behavior citations. The report prepared by the FACES therapist notes B. "has received eight (8) Behavior Citations from her school in which she has hit other children, screamed insults at children or disobeyed classroom and teacher rules. B[.]'s grades have also dropped significantly from 2010-2011 to the 2011-2012 school year."

The FACES therapist found B. "articulate," "affectionate and warm," "with age appropriate intelligence," and "a great sense of humor," but summarized her precarious condition: "B[.] presents [as] anxious and unable to further contain the animosity and tension with the adults in her life. Her attention is limited to making her demands or reaching her goals, but often drifts and wanders when she is being spoken to. B[.] is hyper vigilant in the adult conversations around her, and demonstrates a poor sense of boundaries and limits."

According to the therapist's interview with Trejo, who had been laid off from her customer service or receptionist job nearly a year earlier, Trejo believed Raygoza instructed B. to call her "ugly and fat," to hit other children at school, and generally to behave poorly. She believed it was "her right to know" everything that occurred in Raygoza's home while B. was there, and expressed frustration that Raygoza did not agree with her in "all things concerning" B., including what clothes she should wear and how to launder them. Trejo did not care for Raygoza's girlfriend, Corey, and indeed "admits she will never speak with her." Raygoza had previously dated Corey before his relationship with Trejo, and then resumed the relationship after he and Trejo failed to reconcile after B.'s birth.

During a visit at Raygoza's home, the therapist observed Corey "working through many of B[.]'s demands by 1) getting at eye level with her, 2) pacing her voice and tone, 3) being patient, and 4) being firm but democratic." Corey made a snack for B., "sliced tomatoes, which B[.] explained . . . are her 'favorite' . . . and was completing a baking treat she promised B[.]," who "consistently approached Corey for help and questions while being interviewed to which Corey responded with patience with the child . . . ."

B. enjoyed living with Corey and her 12-year-old daughter, with whom she shared a room, and when the therapist first arrived for the home visit, she found B. playing with the daughter and with B.'s 18-year-old older brother, Omar, Jr., in the front yard. The three appeared bonded and played together for most of the interview. B. took a break to give the therapist a tour of the home, beginning with her favorite room: Omar, Jr.'s, where she enjoyed watching T.V. with him.

According to Trejo, when Omar, Jr. was in junior high school, he asked to live with his father permanently and Raygoza gained full custody of their son. According to Raygoza, however, Trejo failed to maintain a relationship with her son and it had degenerated to the point she ceased speaking with Omar, Jr. for the last eight months. Raygoza attributed Trejo's recent "irrational and abusive behavior" not only to her disdain for Corey, but also to her resentment against Raygoza that Omar, Jr. chose to live with him.

The only discipline the therapist observed at either Raygoza's or Trejo's home occurred during an incident when B. pounded on Corey's chest with her fists as the therapist was leaving, and Corey responded by slowly moving B.'s hands down to her side, apologizing to the therapist, eliciting B.'s apology, and reminding B. in a firm voice "to never do that again . . . ." For their part, during the therapist's visits, Raygoza and Trejo each merely "pleaded" with B. to "stop" her poor behavior, including interrupting the interview, whining, jumping on beds and furniture, screaming, opening bedroom drawers that did not belong to her, and insulting her parents and stepparents ("I hate you," "You're mean").

Trejo's husband, John Morin, admitted B.'s behavior was "trying" and it had become "easier to just let [Trejo] discipline her own daughter"; for instance, it had been his role to remove "all her Hello Kitty furniture as a punishment" when she misbehaved, but it became "too hard to keep hauling it up and down the staircase, so he simply left it in her room." According to the therapist, both Morin and Corey "do their best to contain" Raygoza and Trejo's "feuding," and both stepparents felt "remorse for not being able to do more for B[.] who is 'in the middle.'" The therapist observed Raygoza and Trejo admitted "that they are unable to effectively communicate and co-

10

parent" under their current arrangement, and the therapist noted e-mail and text messages between them "with insults and hostility towards each other, making accusations or discrediting each other's parenting abilities and efforts."

When the therapist asked B.'s parents in separate interviews to state "two good things" about the other, Raygoza replied with only one, admitting that "she is a hard worker," but he also expressed hope and a belief that co-parenting counseling sessions and classes would improve their communication. Raygoza was "especially concerned that he and [Trejo] have yet to agree on a psychologist or therapist for B[.]" For her part, Trejo stated "there was 'nothing good she could say about [Raygoza] as a father.'"

The FACES evaluator highlighted "Reduc[ing] the animosity" as a coparenting goal. The therapist recommended "each of the four parents participate in Co-parenting counseling," including child development education, instruction on the "effects of feuding parents on a child caught in the crossfire of a custody battle," and "[s]uggestions for setting boundaries for their daughter as she appears to be reacting to the stress she is feeling because of the animosity between both sets of parents." The therapist also recommended conjoint parent-child counseling to assist them in "setting boundaries and limits appropriate with [the] child's needs and household goals."

With the § 730 report complete, the trial court conducted a hearing in February 2012 on the parties' competing petitions for sole custody. The trial court had denied the parties' ex parte requests for sole custody pending the § 730 evaluation, and now turned to the custody question. Trejo and Raygoza both testified, and Raygoza made his son and girlfriend available, but Trejo declined to inquire about the dancing incident or other concerns that prompted her ex parte custody motion, and instead expressed her belief that counseling to address the parties' poor communication was sufficient.

11

Raygoza testified his chief concerns remained B.'s poor behavior and grades. In particular, he expressed frustration that Trejo did not follow up on psychological counseling he initiated for B. He explained, "I made two attempts to get a child psychologist. The first attempt, mother pulled the child out of the school and did not keep the appointment . . . . [¶] The second time, I took the child on my day off." At the appointment, "something was said to the child psychologist that the child psychologist made a report to, I guess, social services." [¶] . . . [¶] The psychologist said she would love to see B[.] again, but she needed consent from the mother," but mother did not follow up or ensure alternate counseling.

Trejo explained CPS visited her home following the psychologist's report, but nothing came of the visit and, while she agreed B. needed counseling, she pointed to myriad factors delaying it: one psychologist did not accept cases with high parental conflict, Raygoza was remiss in arranging insurance coverage, and she was still "in the process of setting up" a counseling session with a different therapist.

The trial court asked Trejo whether, as Raygoza had claimed in his declaration, she failed to include him on B.'s emergency notification and authorization card at school, which he claimed initially prevented him from speaking with B.'s teacher about her poor grades and behavior. Trejo claimed she listed Raygoza on the card. He disputed this in his testimony, explaining he and the teacher "looked at the emergency card and it had Ms. Trejo and Mr. Mor[i]n only as mother and stepfather. [¶] My name was not there on the emergency card." The court also asked Raygoza whether his son still lived with him and whether Trejo communicated with him. Raygoza explained "the mother's relationship has never been too good" with Omar, Jr. and that it had been seven or eight months since she had spoken to him, which Trejo did not dispute or rebut.

12

The trial court took the matter under submission and issued a detailed written order later the same day. As in earlier orders, the court noted at the outset it had "taken judicial notice of its own file pursuant to Evidence Code § 452." The court observed it earlier ordered "each parent to permit and encourage communication with doctors, clinics and other health providers regarding the child's health and welfare," for "both parents to have the same access to school, psychological, medical, and dental records pertaining" to B., and for "Respondent [Trejo] to confer with Petitioner [Raygoza] regarding all medical, psychiatric, biomedical intervention and diet, as well as therapeutic intervention decisions, and school decisions."

The court noted the purpose of the § 730 FACES report was to assess "each family's strengths, areas for further development, a summary of information as it may relate to safety issues, alcohol or drug issues, addictions, abuse, living arrangements, and domestic violence." Echoing the FACES report, the court found B. hypervigilant, with "a poor sense of boundaries and limits," and "her attention is limited to making her demands or reaching her goals."

The court concluded: B. "needs discipline" and that, "although the child has spent the greater portion of her life with [Trejo], [Trejo] has been unable, or is unable, to provide the discipline needed to rear this child." The court found Trejo had not established "consistent rules, structure, and discipline" for B., nor communicated effectively with Raygoza about doing so jointly. The court noted B. was "hitting other children, screaming insults and disobeying classroom and teacher rules, as well as having her grades drop," but despite her "acting out in school" and "Behavior Citations," Trejo "has taken no steps to discover why or to make therapeutic correction."

13

The court also observed that Trejo "cut off all communication with one child, Omar Jr." The court found Trejo's refusal to communicate with important people in father's and B.'s life an obstacle to effective coparenting. The court expressed concern that "[i]f custody of B[.] remains with Respondent, then she will have limited contact with her brother." The court found generally that Trejo had "no credibility."

The court noted that each party in their respective December 2011 ex parte motions was "seeking full and exclusive custody," which the court declined to order, based on "'the public policy of this state to assure that children have frequent and continuing contact with both parents.'" The court concluded Raygoza "will best facilitate a good relationship with the other parent, not [Trejo]." Accordingly, the court granted Raygoza legal custody of B. and effectively flipped the parties' original timesharing arrangement, so that B. was placed with Trejo on Tuesdays after school until 7:00 p.m. and on alternating weekends, and the remainder of the time with Raygoza, except during specified timesharing for holidays and over the summer.

The court delayed entry of its order for 10 days, during which Trejo filed a motion for reconsideration. She suggested a CPS social worker and the "730 Evaluator" had "serious concerns" about changing B.'s custody, but she did not subpoena or obtain a declaration from either person. She also attacked Omar, Jr. as a suitable sibling or adult figure in B.'s life and as a poor example of Raygoza's parenting skills, citing Facebook postings attributed to him and evidence he had been a poor student in high school, which she claimed she had not known. The trial court denied the reconsideration motion, and Trejo now appeals.

14

II

DISCUSSION

Trejo does not challenge the trial court's denial of her reconsideration motion. Instead, she argues the evidence did not establish a change in circumstances sufficient for the trial court to consider modifying its existing custody order, and she asserts the court failed to act in B.'s best interests when it granted Raygoza increased custody rights and curtailed hers.

Trejo also challenges the trial court's decision to take judicial notice of its own file. Her reasoning seems to be that because the evidence does not support the trial court's custody change, the court must have relied on some obscure detail in its file of which she was unaware, and therefore the court's judicial notice ruling violated due process by depriving her of an opportunity to challenge the unknown matter. We are not persuaded. The evidence supports the trial court's order without resort to a far-fetched interpretation of the trial court's routine judicial notice ruling. (Evid. Code, § 452, subd. (d)(1) [court files subject to judicial notice].)

The standard of review for custody and timesharing orders is well-settled. "Reversal is justified only for abuse of discretion. [Citation.] The reviewing court must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child. [Citation.]" (*In re Marriage of Carlson* (1991) 229 Cal.App.3d 1330, 1337, disapproved on another ground in *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 37, fn. 9.) Moreover, a substantial evidence challenge requires the reviewing court to accept as true the evidence supporting the trial court's order, and to

15

discard unfavorable evidence; the trial court's credibility determinations are binding and the appellate court may not reweigh the evidence. (*Stokus v. Marsh* (1990) 217 Cal.App.3d 647, 656-657.)

Trejo's relies on the changed circumstances rule in child custody cases. That rule "'provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements.' [Citation.]" (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 256 (*Montenegro*).) *Montenegro* itself, however, cautioned that as here, when the court's order is based on a parenting agreement in mediation, "we must be careful in construing such orders." (*Id.* at p. 258.) The order based on the parties' stipulation constitutes "a final judicial custody determination for purposes of the changed circumstance rule only if there is a clear, affirmative indication the parties intended such a result." (*Ibid.*)

As the high court explained, "many family court litigants do not have attorneys and may not be fully aware of the legal ramifications of their stipulations," which courts often merely rubberstamp without effecting a "final resolution" to the "fluid factual circumstances" of child custody proceedings. (*Montenegro*, *supra*, 26 Cal.4th at p. 258.) That appears to be the case here. Trejo does *no*t in her briefing rely on the original 2006 order granting her physical custody of B. based on the parties' agreement, nor does she cite their 2008 custody modification as an order triggering the requirement to show changed circumstances before custody may be revisited. Trejo relies instead on

16

the October 2011 order for a § 730 evaluation as the event requiring changed circumstances to change custody. Although the court initially declared a change of circumstances would be required to modify the existing custody arrangements, it later labeled the interim October 2011 order as "a temporary parental timesharing arrangement," and nothing in the record suggests either party viewed it as immutable, particularly since each filed custody-change motions while the § 730 evaluation was pending. As *Montenegro* observed, "A stiplulated custody order is a final judicial custody determination for purposes of the changed circumstances rule only if there is a clear, affirmative indication the parties intended such a result." (*Montenegro*, *supra*, at p. 258.)

Nevertheless, even assuming the changed circumstances rule applied, it does not aid Trejo because Raygoza demonstrated a change in circumstances warranting reconsideration of parental custody. Trejo's minimal response to B.'s pervasive poor school performance and disruptive behavior established a basis for the trial court to reevaluate custody and B.'s best interests. As we explain, the record supports the trial court's ruling.

First, however, Trejo raises a host of minor quibbles on appeal about B.'s report card and behavior citations. She suggests, for example, that some marks on the report card may have been misinterpreted and she complains that Raygoza did not authenticate the behavior citations. She also notes he only produced five of eight alleged citations, and that no teacher testified to explain whether citations were routinely issued or reserved only for more serious infractions. Trejo also complains Raygoza offered no explanation of the marks on B.'s report card, whether there were higher expectations in

first grade than kindergarten, or whether B.'s performance actually declined from kindergarten.

These belated attacks and attempts to reargue the evidence are misplaced on appeal in light of the standard of review. For example, the "missing" three citations that father did not produce could be explained by the fact B. received them after Raygoza's school visit, thus pointing to a continuing downward trend in her behavior. Similarly, Trejo's failure to challenge the authenticity of B.'s school documents, which no one questioned below, or to raise hearsay objections to them forfeits these and related issues. (Evid. Code, § 353 [no basis for reversal absent objection below]; see, e.g., *Flood v. Simpson* (1975) 45 Cal.App.3d 644, 649 [hearsay evidence is competent to support judgment absent specific hearsay objection].) Accordingly, no corroborating teacher testimony was required because the behavior citations on their face described troublesome behavior, including destroying teacher property and striking other students, and the report card separately and similarly noted B. needed to improve her below satisfactory behavior by better "Observ[ing] Classroom and Playground Rules," and "Respect[ing] Rights and Property of Others."

Nor was there any ambiguity in B.'s report card that she exhibited "Below Basic" academic performance, confirmed by a parent-teacher conference report showing she was already "at Risk of Retention." Her report card defined "Below Basic" as "*Minimal Understanding of Grade Level Standards*," which the trial court reasonably could find problematic in essential, elementary-level subjects like Reading, Writing, and Spelling. Trejo claimed in her reconsideration motion that she only became aware of B.'s poor school performance when Raygoza appeared at B.'s school on December 9th to check her progress. But the trial court reasonably could find Trejo minimized B.'s

18

difficulties and her own responsibility to stay informed and responsive to B.'s needs, given that multiple school progress reports showed B.'s "Below Basic" performance. Nor did Trejo address B.'s failing report card or the retention risk her teacher identified in a parent-teacher conference with Trejo. The court could infer Trejo attended the conference because a checkbox on the form reflected a parent's presence, and Trejo had not provided the school with Raygoza's contact information.

Furthermore, the record does not reflect Trejo did anything to address the deterioration in B.'s school behavior since kindergarten. The court reasonably could conclude Trejo minimized B.'s problems. She suggested in her declaration that she did not learn until Raygoza's December visit of B.'s poor behavior, but to the contrary, B.'s first grade behavior record included serious citations in September, and extended back to kindergarten. The doubling of behavior citations B. received in just one semester of first grade compared to all year in kindergarten was troubling and furnished grounds for review of the custody arrangements, especially given the link in the § 730 evaluation between B.'s conduct and parental acrimony.

Trejo questions why the trial court reduced *her* custody time when she and Raygoza both admitted to the § 730 evaluator "that they are unable to effectively communicate and co-parent B[.]" The therapist noted mutual parental antagonism in the form of "messages with insults and hostility towards each other, making accusations or discrediting each other's parenting abilities and efforts." Trejo suggests "[t]he issue of poor communication skills and animosity between the parties [wa]s not new."

But B.'s school and behavior problems had grown worse, and the trial court reasonably could lay a greater share of blame with Trejo as the primary custodial parent charged "ultimately" in earlier court orders with final responsibility for making "school

19

decisions" and "therapeutic intervention decisions." While Trejo apparently enrolled B. in after-school tutoring at some unspecified point in December, the trial court reasonably concluded her failure to obtain counseling for B. on her more serious behavior and discipline problems placed B. at risk of further psychological harm stemming from the acrimony between her parents. In contrast, Raygoza correctly recognized the need for professional intervention and sought immediate help, which Trejo seemed to resist despite the benefit it held for B. For instance, Trejo pulled B. out of school to avoid an initial counseling session scheduled by Raygoza.

The trial court was not required to credit Trejo's explanations for the delay. The court expressly found Trejo lacked credibility. The court could find she lied when she testified she placed Raygoza's name on B.'s emergency card, thereby undermining her credibility with the court on other matters, which we may not second-guess. For instance, a reasonable trier of fact could find in Trejo's excuses an unacceptable delay in arranging counseling for B., thereby abdicating her responsibility to arrange "therapeutic intervention." She failed to meet that responsibility by the date of the court hearing in late February 2012, months after Raygoza discovered and demanded changes to address B.'s continuing behavioral problems. A reasonable trier of fact could infer Trejo dragged her heels to retaliate against Raygoza for acting first on the counseling matter, contrary to B.'s best interests.

In any event, the trial court's ruling was bolstered by the fact Trejo could not communicate effectively with *any* adult in Raygoza's household, including her own son, suggesting she bore significant responsibility for the communication and coparenting impasse with Raygoza. This is particularly true given the trial court had identified in its October 2011 order the importance of parental self-sacrifice in ensuring harmonious

20

family relations, especially "with *the other parent's family*." (Italics added.) The court reasonably could conclude Trejo's inability to put aside her antagonism to Raygoza, Corey, and Omar, Jr. jeopardized B.'s emotional well-being.

Trejo argues the trial court erroneously relied on B.'s sibling relationship with her brother, given he was no longer a child, but the trial court reasonably could conclude a parent's ability to foster family relationships was important to B.'s best interests. Trejo also suggests the record is consistent with the possibility Omar, Jr. was responsible for the rift with his mother, since he was now an adult. The standard of review, however, precludes this reading and, moreover, it was the trial court's prerogative to credit Raygoza's testimony that "mother's relationship ha[d] never been too good" with Omar, Jr. For all the foregoing reasons, having determined changed circumstances existed to warrant a change in custody, the trial court reasonably could conclude Raygoza, not Trejo, would better "facilitate a good relationship with the other parent," and thereby begin to reduce the acrimony so damaging to B.'s best interests.

III

DISPOSITION

The trial court's order is affirmed. The parties shall bear their own costs on appeal.

ARONSON, J.

WE CONCUR:

MOORE, ACTING P. J.

THOMPSON, J.

21