Filed 5/28/21  S.T. v. L.R. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| S.T.,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>L.R.,<br><br>    Defendant and Appellant. | B304069<br>(Los Angeles County<br>Super. Ct. No. BF055670) |

APPEAL from an order of the Superior Court of Los Angeles County, Emily T. Spear, Judge.  Affirmed.

Law Offices of Charles O. Agege and Charles O. Agege for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

L.R. (Father) appeals a family court order giving respondent S.T. (Mother) custody of their son Joey. There was no abuse of discretion in the court's custody and visitation order or its procedural rulings. The record supports the finding that changed circumstances mandate removing Joey from Father to serve the boy's best interests. (Fam. Code, § 3020, subd. (a).)[1] We affirm.

## FACTS AND PROCEDURAL HISTORY

In 2016, Father petitioned for sole legal and physical custody of the parties' three children, including Joey (then five years old).[2] Mother agreed to give Father physical custody of the children; she requested joint legal custody plus weekend and holiday visits.

After a hearing, the court issued a judgment in 2017 (the Judgment). Father received sole physical custody; the parties shared legal custody. Mother was given weekend visits with Joey and ordered to pay child support.

In December 2018, Mother filed a request for order (RFO) to modify the Judgment. She sought sole legal and physical custody of Joey, declaring that Father prevents her scheduled visits with Joey and police have intervened on numerous occasions. Despite their joint legal custody, Father does not inform Mother of Joey's illnesses or school conferences and refuses to let Joey participate in family therapy. Father makes malicious comments about Mother to Joey (calling her " 'a stupid

---

[1] Undesignated statutory references are to the Family Code.

[2] Joey was born in 2011. His siblings have reached the age of majority and are not involved in this appeal.

bitch' ") and causes Joey to feel worried and guilty about visiting Mother.

A contested hearing began in July 2019.[3]  Mother testified that Father weeps when Joey goes for visits and has poisoned the boy against her.  As a result, she spends little time with Joey and feels he is neglected.  Father testified that Mother reported him to child protective services, allowed a friend to hit Joey, and is seeking custody to avoid paying child support.

At the initial hearing on July 25, the court found no change in circumstances but told Father to assure Joey that it is safe to spend nights with Mother, to allow her to have weekends with her son.  The court ordered Father to allow Mother to call Joey, so they can speak regularly during the week.

The court ordered the parties to participate in a parenting plan assessment (PPA), in which an evaluator interviews the family and investigates complaints about child safety.  The court divided the $975 cost of the PPA between the parties, noting that they could apply for a fee waiver.  Father requested a fee waiver; the court approved his request on August 12.

The PPA was scheduled for August 16.  On August 26, family court services notified the court that the PPA was canceled because Father did not pay the PPA fee.

On October 16, the court reinstated the PPA and continued the matter to December.  It made temporary orders giving Mother sole legal and physical custody of Joey and suspending

---

[3]  Undesignated dates refer to the year 2019.

3

Father's visits.[4]  The court denied Father's two subsequent ex parte requests for custody of Joey on October 22 and November 4.

The court resolved Mother's petition on December 4. Father's counsel asked to present evidence.  The court rejected the request as untimely.

## Testimony of the PPA Evaluator

A child custody evaluator testified that the parties' 20-year relationship ended in 2016, when Mother discovered that Father is in a long-term relationship with someone else, with whom he has four children.  Mother ejected him from the home.

Mother said Father "pinned her up against the wall by her neck a few times" and has anger issues.  Father denied a history of domestic violence.  When the parties separated, Mother had custody of Joey.  Soon after, the Los Angeles County Department of Children and Family Services (DCFS) became involved. Father obtained custody of Joey.  There were three referrals to DCFS, two in 2016 and one in 2019; all were deemed unfounded.

Although Mother had the right to weekend visits for over three years, Joey never spent the night with her until recently. Father claimed he did not stop Mother from having overnight visits.  After reviewing text messages between the parents, the evaluator believed that Father prevented Mother's court-ordered visits.

Mother is an office manager.  Father has been on disability since 2016 and depends on general relief, food stamps, and SSI payments for Joey's disability.  Father drives but does not have a driver's license.  His criminal history includes making criminal

---

[4] The reporter's transcript does not show what transpired on October 16; instead, it repeats verbatim the July 25 hearing.

threats (1998), contempt of court (2000), grand theft (2015), and driving without a license (2014).

Though Father denied telling Joey to return at night, Joey told the evaluator, "Father did not want him to spend the night at Mother's house." When confronted, Father admitted telling Joey he was "going to be unhappy and sad" if Joey stayed with Mother. Father did not think this would make Joey feel bad. Despite his youth, Joey "feels that he has to take care of his father's feelings." Mother "never pushed him to spend the night because she didn't want to cause their son distress, because he knew that Father would get mad" if he stayed with her.

The evaluator opined that Father manipulated Joey, a young, impressionable child, to "make him feel guilty for spending time with his mother." It was inappropriate for Father to tell Joey, "I will be sad while you're gone." She recommended that Father receive counseling.

Although it was initially difficult for Joey to be uprooted and moved to Mother's home in October, he adapted easily, is more expressive and happier, and made new friends. Father threatened to remove Joey from school after the court transferred custody to Mother. The evaluator did not feel that Father neglected Joey, even if the child had knots in his hair or ate frozen rather than fresh food at Father's home.

Mother was concerned for Father's mental stability. He attempted suicide twice and threatened to "put a bullet" in her head and shoot their children. Father said it was not "a real suicide attempt" and he only pretended to overdose. He owns a gun but denied threatening to shoot Mother or the children. A family member heard Father cry after losing custody of Joey, threaten to kill himself and Joey or take Joey to Nevada. The

couple's older children do not want to be involved in this case, fearful of provoking Father's anger.

After Mother took custody of Joey, Father failed to bring her the boy's medications; she had to get new medications when he became ill from asthma. Joey had difficulty understanding the evaluator's questions, perhaps due to a learning disability or processing disorder. Joey understood that the judge would decide where he was going to live. He referred to Mother's boyfriend as "his best friend." Joey realizes that Father lied when he said Joey could not spend nights with Mother. Joey wants to be fair and spend time with both parents.

The evaluator opined that Father should exercise discretion about the information he shares with Joey and be supportive of Joey's relationship with Mother. She recommended therapy and monitored visits for Father, followed by a report when therapy ends. Father should provide Mother with information about Joey's disability. The evaluator recommended that Mother have custody of Joey. Joey would be at risk of trauma if Father has custody because he has prevented Mother from having court-ordered visits for nearly four years.

### The Court's Ruling

After hearing from the PPA evaluator, the court found a substantial change in circumstances. It found: (1) Joey's time with Mother was "severely limited" for three and a half years; (2) Father "was manipulating Joey into not spending valuable custody time with mom" and "putting pressure on Joey to not have a relationship with mom"; (3) Father's conduct was "detrimental to [Joey's] relationship with mom"; (4) Father made "age-inappropriate comments" to Joey, who was only five when

6

Father took custody; (5) Mother is likely to ensure that Joey is happy and spends time with Father.

The court adopted the recommendations in the PPA. It gave Mother legal custody; Father has supervised visits three weekends per month; Joey is in Mother's care at all other times; Mother will transport Joey; the parents cannot disparage each other in Joey's presence; they must communicate on-line about Joey in a respectful manner; Father must participate in a minimum of 26 individual therapy sessions; Father must provide information about Joey's learning disability to Mother; and Mother's child support obligation was terminated. The court said Father's visits are supervised to stop him from "putting pressure on Joey that is unfair" by saying he is sad and lonely when Joey is with Mother.

## DISCUSSION

### 1. Continuance of Hearing in July

Father argues that the court abused its discretion by continuing the July 25 hearing on its own motion while a PPA was being prepared. Father contends that the court should have denied Mother's RFO "outright and call[ed] it a day." Father is mistaken.

The court's primary concern in custody disputes is "the well-being of the children, not the preferences of the parties," and it may order modifications of custody " '*at any time*' " to benefit the child. (*In re Marriage of Olson* (2015) 238 Cal.App.4th 1458, 1463–1464 (*Olson*); § 3087.) Mother carried her initial burden of showing changed circumstances by testifying that Father prevented her weekend visits with Joey for over three years.

The court may have an evaluator assess custody and visitation rights in a contested proceeding. (§ 3111; Cal. Rules of

Court, rule 5.220.)  It was not an abuse of discretion to continue the hearing to allow an evaluator to interview Joey, his parents, and others.  The purpose of the continuance was to give the court time to collect the information needed to determine Joey's best interests.  (§ 3020, subd. (a).)

**2.  Interim Rulings Are Not Reviewable**

We start with the rule that postjudgment orders that are " 'preparatory to later proceedings' " are not appealable.  (*Olson, supra,* 238 Cal.App.4th at p. 1462.)  An order that the parties attend a PPA is not final.  (*Ibid.*)

Father cites the court's interim ruling on July 25.  It left in place the custody arrangement described in the Judgment and ordered a PPA.  Five months later, Father's counsel argued that the court did not find a change of circumstances on July 25.  The court replied, "[W]hatever I said on July 25th . . . is not relevant to these proceedings."  The court was correct:  It issued a final order after hearing testimony from the custody evaluator.  The final written order is the only order subject to our review.

Father makes several contentions about the October 16 hearing.  We do not know what was said at the hearing because the reporter's transcript is not in our record.  (See fn. 4, *ante.*)  From the minute order, we know the court reinstated the PPA, which the evaluator canceled without realizing Father had a fee waiver.  Mother was sworn and testified, though we do not know the substance of her testimony.  The court awarded Mother temporary custody after the hearing.

Father claims the court "stripped [him] of his entire custodial rights to Joey, based on its erroneous finding that the PPA was canceled due to nonpayment" of fees by Father.  No evidence supports Father's claim.  It is pure speculation that he

8

was punished because of PPA fees.  In any event, the *temporary* custody order was superseded by the *final* order that Father has appealed.  (*Lester v. Lennane* (2000) 84 Cal.App.4th 536, 559–560 [a temporary custody order is interlocutory]; *Banning v. Newdow* (2004) 119 Cal.App.4th 438, 456 [same].)

Father claims the court erred by denying the ex parte requests for custody he made while Mother's RFO was pending.  The summary denials of Father's requests in October and November are not reviewable.  They were superseded by the court's final written order in December modifying the Judgment.  (*Olson, supra,* 238 Cal.App.4th at p. 1462.)

### 3. Denial of Additional Parental Testimony

On December 4, Father asked to present testimony.  The court denied his request because it "was not made in a timely fashion.  [Mother] was entitled to notice of the 217 hearing in case she wanted to bring in her own witnesses and you did not provide her with any notice that it was going to happen."

Under section 217, the court receives live, competent, admissible relevant evidence at a hearing on a RFO.  (Cal. Rules of Court, rule 5.113(a).)  The court mistakenly believed notice is required if a *party* asks to testify at the hearing.  A witness list describing anticipated testimony must be served "to present live testimony from witnesses *other than the parties*."  (§ 217, subd. (c), italics added.)

Although the court misconstrued the notice requirement, it gave reasons for denying testimony.  The court was "pretty familiar with this case" from the parties' prior appearances; it reviewed Father's declarations seeking custody and restraining order documents; and, "I believe that I have enough information to make a ruling based on what I've heard so far."

9

The court's refusal to hear more testimony was not an abuse of discretion. It heard live testimony from the parties on July 25 and October 16. Citing its familiarity with the case, it deemed additional testimony unnecessary. (Cal. Rules of Court, rule 5.113(b)(3).) Father's attorney cross-examined the custody evaluator, which allowed Father "to question anyone submitting reports or other information to the court." (*Id.*, rule 5.113(b)(4).) The reasons the court gave for excluding further testimony constituted good cause. (*Id.,* rule 5.113(c).)

### 4. Modification of Custody Order

The court's "overarching concern is the best interest of the child" in custody and visitation disputes. (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255; § 3020, subd. (a).) The court considers all relevant factors, including the child's health, safety and welfare and the nature and amount of the child's contact with the parents. (§ 3011, subd. (a).) It has "the widest discretion to choose a parenting plan that is in the best interest of the child." (§ 3040, subd. (d).) We review custody and visitation orders under "the deferential abuse of discretion test." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) We determine if factual findings are "supported by substantial evidence concerning the 'best interest' of the minor children." (*Ibid*.)

The evidence showed Mother was deprived of court-ordered weekend visits for years. Though Father claimed not to be the source of the problem, Joey told the evaluator Father "did not want him to spend the night at Mother's house" and burdened the child with guilt, saying he would be "sad" if Joey stayed with Mother. The evaluator reviewed Father's messages to Mother and believed Father prevented visits. His conduct violated "the public policy of this state to ensure that children have frequent

and continuing contact with both parents after the parents have . . . ended their relationship." (§ 3020, subd. (b).)

The court's order for supervised visits falls within the scope of its duty to act in Joey's best interests. Mother said that Father engaged in domestic violence and threatened to kill her and the children. A family member heard Father say, after the court changed custody in October, that he would kill himself and Joey or take Joey to Nevada. He engaged in manipulative behavior with a young, impressionable child. He has a history of suicide attempts and did not provide Mother with Joey's asthma medication, posing a risk to the boy's health. Though Father denied misconduct, the court did not find him credible. We do not reweigh credibility determinations on appeal.

Protective measures such as supervised visits may be ordered if a party has previously withheld a child in violation of the other parent's visitation rights, has threatened to take the child, or has a history of noncooperation. (§ 3048, subd. (b)(1)–(2).) Limitations on Father's visitation serve not as punishment "but as a means to prevent a potential future tragedy." (*In re Marriage of Economou* (1990) 224 Cal.App.3d 1466, 1486–1487 [citing risk that a father would abscond with the children].)

To ensure Joey's safety and welfare, the court required Father to participate in counseling. (§ 3190.) Father denied that his weeping, demands that Joey avoid Mother, and his insulting statements about Mother affected Joey; however, the evaluator spoke to Joey, who felt responsible for Father's feelings and guilty when he saw Mother. The requirement of 26 counseling sessions was not an abuse of discretion.

11

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED.

LUI, P. J.

We concur:

CHAVEZ, J.

HOFFSTADT, J.

12