Filed 6/11/13  In re Ethan H. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ETHAN H., a Person Coming Under the Juvenile Court Law. | B244571<br>(Los Angeles County<br>Super. Ct. No. CK76636) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>LORI A.,<br><br>        Defendant and Appellant. | |

        APPEAL from findings and orders of the Superior Court of Los Angeles County. Terry T. Truong, Juvenile Court Referee.  Affirmed.

        Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

        John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Timothy M. O'Crowley, Deputy County Counsel, for Plaintiff and Respondent.

_____

Lori A. (mother) appeals from the juvenile court's jurisdictional findings and dispositional orders made on September 19, 2012, removing her son, Ethan H. (Ethan, born Dec. 2006), from her custody. The juvenile court terminated jurisdiction with an exit order giving Ethan's father, Anthony H. (father), sole legal and physical custody of Ethan. The juvenile court ordered that mother's visits with Ethan be monitored until she completed a drug treatment program, with random drug testing and individual counseling.

On appeal, mother claims: (1) the juvenile court's jurisdictional findings are not supported by substantial evidence; and (2) the juvenile court abused its discretion in revising the existing custody order and fashioning the exit order.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Referral of Neglect*

This family came to the attention of the Department of Children and Family Services (DCFS) on May 29, 2012, after DCFS received a telephone call alleging that mother was abusing drugs, including methamphetamine, marijuana, and oxycodone. The caller told DCFS that mother had twice passed out while caring for Ethan and that once, Ethan had cried uncontrollably because he believed that his mother was dead. The caller also reported that mother had sent a text message to an unidentified person, saying, "please get over here, I'm passing out, I don't know what I took and Ethan is here, please[,] I need help."

DCFS reported regarding its prior involvement with the family. On March 16, 2009, when he was just two years old, Ethan had been detained as a result of general neglect due to domestic disputes between mother and father. Father eventually obtained sole physical custody of Ethan, and mother was ordered to have monitored visits.

Father informed the social worker that approximately one year after the prior juvenile court case was closed, he allowed mother to have monitored visits. After a year of monitored visits, father allowed mother to have unmonitored visits. During the time Ethan was having unmonitored visits with mother, she became involved in violent

2

relationships with two different men.  Mother claimed that she was unknowingly drugged by her friend, but acknowledged that Ethan was present during the incident.

The social worker met with mother at mother's home, with a police officer present.  Mother had called law enforcement about a domestic violence issue she was currently experiencing.  Mother reported that the prior dependency court involvement was overwhelming and she was not going to go through it again.  She told the social worker that she would move away and get out of Ethan's life.  The social worker encouraged mother to stay involved, for Ethan's sake.  The social worker advised mother to get help to protect herself from abusive relationships and substance abuse.

The social worker requested that mother submit to random drug testing, but mother refused.  Mother claimed that she could not drug test on that day due to a doctor's appointment, but offered to test the following day.  When the social worker suggested that she submit to the drug test after her doctor's appointment, mother became upset and walked out, stating:  "'I'm not going through this bull shit.  You can have him.  This is bull shit.'"

Ethan told the social worker that once, when he was with mother, she would not wake up.  He was very scared, thought she had died, and cried a lot.  He told the social worker that he missed his mother and that he cried for her.

On June 28, 2012, DCFS placed Ethan into protective custody and released him to father.

*Welfare and Institutions Code Section 300[1] Petition*

DCFS filed a petition pursuant to section 300, subdivision (b), alleging that mother had a history of substance abuse and was an abuser of prescription medication, which resulted in an incident where she lost consciousness while Ethan was in her care.

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

3

At the initial hearing on the section 300 petition, the juvenile court found a prima facie basis for detaining Ethan and removed him from mother's custody. Mother was granted monitored visitation, and father was not permitted to monitor those visits.

*Jurisdiction/Disposition Report (Aug. 17, 2012)*

DCFS reported that on January 25, 2011, the juvenile dependency court had previously terminated its jurisdiction with a custody order providing that father had sole physical custody of Ethan, the parents shared joint legal custody, and that mother had monitored visitation.

On August 11, 2012, the social worker interviewed Ethan. He recounted the story of when his mother had passed out and would not wake up. Ethan said, "'I just waiting and stop crying, and then I go watch tv.'" When asked if he was crying, Ethan responded that he was. When asked if he tried to wake his mother up, Ethan replied, "'[m]y body was on her. She wouldn't get up.'"

Previously, on August 1, 2012, the social worker had interviewed father. He informed the social worker that when he liberalized mother's visits to unmonitored, he did not know that she was using drugs. He also advised the social worker that his wife, Heather W. (Heather),[2] did not know that mother was using drugs. Father indicated that mother was loving and caring to Ethan.

Father further said that Ethan was having unmonitored visits with mother on Mondays, Wednesdays, and Saturdays or Sundays for a few hours; he denied that he had allowed overnight visits. Father recalled one incident on March 23, 2012. At that time, father went to a wedding and had asked mother to watch Ethan at the last minute. Upon returning home, Ethan told father that mother had fallen asleep and that he believed that mother was dead.

---

[2] The record is inconsistent regarding father's relationship with Heather—while father represents that she is his wife, the record also indicates that she is father's girlfriend.

4

Father spoke to mother and she admitted that she fell asleep for about 10 minutes. Father told the social worker that mother seemed fine when he dropped Ethan off and picked him up, and he had no reason to believe that mother was using drugs.

Father was shocked that mother refused to drug test. He believed that mother would provide random drug testing to prove that the allegations were false. Once he heard that mother refused to drug test, he then agreed that mother's visits needed to be monitored.

Father remembered that mother previously had back problems and took Vicodin in around 2008. He also remembered that during the prior juvenile court case, mother was using medical marijuana.

Finally, father told the social worker that mother had difficulty functioning. He said that Ethan was "everything" to him. Father understood that Ethan's visits with mother needed to be monitored, and he was willing to monitor them himself, which had been done in the past.

Mother left a telephone voicemail message with DCFS, advising the social worker that she was not able to be involved with DCFS and the juvenile court a second time. She told the social worker that the first juvenile court involvement was too painful; she offered to sign over her parental rights to Ethan rather than go through it again. In the message, mother also talked about being evicted from her apartment, missing court because her car broke down on the way and she had to abandon her vehicle. Additionally, she told the social worker that her cat had died. In the message, mother appeared to be emotionally overwhelmed.

But, on August 11, 2012, the social worker interviewed mother. Mother indicated that although she had used methamphetamine in the past, she denied any recent or current methamphetamine abuse.

Mother believed that the allegations of child abuse were made by her ex-boyfriend, Brett C. (Brett), because of a grudge over money. She told the social worker that Brett had called the police reporting harassment almost every night. She claimed that Brett threatened her, claiming that he had a video of her on drugs. She also informed

5

the social worker about an incident during which she was cooking a meal in the kitchen and suddenly felt strange and faint, as if she was going to pass out. Brett told her it was okay and took her to the bathroom. Mother remembered sending a text message to father to come and care for Ethan. She believed that Brett had drugged her because she had not taken anything that day that would have made her feel that way. She believed that Brett was experimenting with her because she later claimed to have found several women that Brett had allegedly drugged, raped, and robbed. Mother claimed that the calls to the police stopped when Brett was incarcerated. The social worker confirmed that Brett was then incarcerated.

Mother advised the social worker that Brett had recently been injecting methamphetamine. She explained that she previously refused to drug test because she had a doctor's appointment. Although she offered to test the following day, mother claimed that she had not been permitted to do so.

Mother further informed the social worker that she had a prescription for medical marijuana, Vicodin, and Percocet for her back pain. She also had a prescription for Xanax for anxiety; in fact, she showed the social worker a prescription for generic Xanax, dated July 19, 2012. But, she could not afford to fill her prescriptions. So, mother usually waited until the pain was unmanageable before she took any medication. Mother told the social worker that because she could not afford to go to the doctor to fill the prescriptions, she would "'buy a pill here and there from a friend.'"

Mother also told the social worker that she did not take "'anything'" that would affect her ability to take care of her son.

Regarding the incident when mother fell asleep, mother confirmed that she had been watching Ethan while father was at a wedding and that she did fall asleep. She said that she was hung over from drinking with friends the night before and was tired. When mother was asked about domestic violence in a relationship with a man named Scott, who she was dating just prior to her current boyfriend, mother told the social worker that "'[t]here are problems in every relationship.'"

6

Mother told the social worker that she did not think that she could participate in anything court-ordered because she was too traumatized by her previous involvement with the juvenile court and DCFS. She did not think she could participate in random drug testing.

Heather told the social worker that she saw mother regularly and did not suspect that mother was using drugs. Heather informed the social worker that mother was cordial and respectful, and that mother and father were respectful to each other. Concerning the incident when mother watched Ethan while father was at a wedding, Heather stated that mother seemed fine when they dropped Ethan off, and she seemed fine when Ethan was returned to their care. Heather was unaware of mother's back problems and did not know whether mother had prescription medication for pain or anxiety.

Mother had not visited Ethan since June 28, 2012.

Based on the foregoing, the social worker opined that there was strong evidence to support the allegations in the petition. The social worker noted mother's history of substance abuse and mother's admission to the current use of marijuana, Vicodin, and Percocet for back pain, with prescriptions. While mother claimed that Dr. Paul Deronda had provided prescriptions, she could not confirm any of her current prescriptions to the social worker and could not provide the social worker with the doctor's telephone number.

The social worker believed father and Ethan's statements and confirmed that mother had passed out while Ethan was in her care. Ethan was crying, terrified that his mother was dead because he could not wake her. The social worker believed that mother was struggling with many areas of her life, including housing, employment, relationships involving violence, parenting, and mental health. She also believed that mother's current substance abuse was a significant contributing factor to her low level of functioning. She believed that mother's substance abuse placed Ethan at risk of harm.

Finally, the social worker opined that father, who knew he was violating the court order by allowing mother to have unmonitored contact with Ethan, had failed to protect Ethan from the risks of mother's negligent conduct.

7

Based on the foregoing, DCFS recommended that the juvenile court find the allegations in the section 300 petition to be true, that the juvenile court terminate jurisdiction with an exit order, and that the juvenile court admonish father that any failure to comply with the exit order would result in the removal of Ethan from his custody.

*Jurisdiction/Disposition Hearing (Sept. 19, 2012)*

At the jurisdiction and disposition hearing, the juvenile court found the section 300 petition to be true as amended.[3] It removed Ethan from mother's custody and terminated dependency jurisdiction with an exit order providing that Ethan's sole physical and legal custody be given to father. Mother was granted monitored visits; she was required to complete a substance abuse program with random testing and individual counseling.

*Appeal*

Mother's timely appeal ensued.

## DISCUSSION

I. *Substantial evidence supports the juvenile court's order sustaining the section 300 petition*

A. Standard of review

As the parties correctly agree, we review the juvenile court's order for substantial evidence (*In re David M.* (2005) 134 Cal.App.4th 822, 828), keeping in mind that the primary purpose of dependency proceedings is to serve the best interests of the child. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.) "'All conflicts must be resolved in favor of [DCFS] and all legitimate inferences indulged in to uphold the [findings], if possible.'" (*In re Kristin H.* (1996) 46 Cal.App.4th 1635, 1649.) We may not reweigh

---

[3]    The amended petition as sustained read: "[Mother] has a history of substance abuse and is an abuser of prescription medication which renders the mother incapable of providing regular care of the child. In May 2012, the mother was under the influence of prescription medication to such a degree that the mother lost consciousness while the child was in the mother's care and supervision. The mother's substance abuse endangers the child's physical health and safety and places the child at risk of harm."

the evidence or redetermine the facts. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199–200.)

B. Mother's conduct placed Ethan at substantial risk of harm

Section 300, subdivision (b) provides, in relevant part, that a child may fall within the jurisdiction of the juvenile court if that "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left." (§ 300, subd. (b).) Three elements are necessary for a jurisdictional finding under section 300, subdivision (b): "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

Ample evidence supports the juvenile court's determination that mother's neglectful conduct placed Ethan at substantial risk of harm. She abused drugs and, on one occasion, passed out while Ethan was in her care and custody. Although mother claims that she had been unwittingly drugged by a friend, the juvenile court was permitted to weigh—and reject—her proffered explanation.

In urging us to reverse, mother relies upon *In re Destiny S.* (2012) 210 Cal.App.4th 999, *In re Drake M.* (2012) 211 Cal.App.4th 754, and *In re Alexis E.* (2009) 171 Cal.App.4th 438, 453 and points out that "a parent's use of marijuana, hard drugs or alcohol, without more, does not bring a minor within the jurisdiction of the dependency court." Regardless of whether mother's assertion is true, it is undisputed that there was "more" here. While she was caring for Ethan, mother passed out and could not be awakened. A young child is certainly at risk of harm if his caregiver uses drugs and/or alcohol and passes out to the point of being unable to wake up.

II. *The juvenile court's exit order was not an abuse of discretion*

A. Standard of review

Section 362.4 authorizes the juvenile court "'to make custody and visitation orders that will be transferred to an existing family court file and remain in effect until modified or terminated by the superior court.'" (*In re Chantal S.* (1996) 13 Cal.4th 196, 203.) Such an order is commonly referred to as an "exit order." (*In re John W.* (1996) 41 Cal.App.4th 961, 970.) Again, the parties agree that we review juvenile court exit orders for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.)

B. The juvenile court's exit order was not an abuse of discretion

Considering that mother was drug-involved (and one of her recent partners was also drug-involved), had disregarded prior court orders for monitored visits, had cared for Ethan while under the influence of drugs to such a degree that she passed out, and was involved in relationships marked by domestic violence, the juvenile court acted well within its discretion in granting father sole legal and physical custody and ordering that mother complete a substance abuse program with random testing and individual counseling.

**DISPOSITION**

The juvenile court's findings and orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
        ASHMANN-GERST

We concur:

_____, P. J.     _____, J.*
    BOREN                           FERNS

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.