[No. S090699. July 30, 2001.]

ALEX MONTENEGRO, Plaintiff and Respondent, v.
DEBORAH DIAZ, Defendant and Appellant.

## COUNSEL

Covington & Crowe, Katrina West and Donald C. Haslam for Defendant and Appellant.

Tuckerman & Thompson and Byron C. Thompson for Plaintiff and Respondent.

Starre & Cohn, Shelley L. Albaum and Harold J. Cohn as Amici Curiae on behalf of Plaintiff and Respondent.

Sissie L. Barker and P. Timothy Pittullo for Minor.

Leslie Ellen Shear for Levitt and Quinn Family Law Center, Inc., Association of Certified Family Law Specialists, Inc., Harold J. Cohn, Douglas Darnell, Robin Drapkin, Lyn Greenberg, Lee Lawless, Hugh McIsaac, Nancy Oleson, Philip M. Stahl, Peter Walzer, Richard Warshak, Leonard Weiler and Linda Wisotsky as Amici Curiae on behalf of Minor.

Sandra E. Purnell for Mary A. Duryea as Amicus Curiae.

## OPINION

**BROWN, J.**—In a story that has become all too familiar, Deborah Diaz and Alex Montenegro could not agree on custody and visitation over their son, Gregory. During the child custody proceedings, Diaz and Montenegro entered into various stipulations, confirmed by the trial court, "resolving" their disputes over Gregory. In the last such stipulation, Diaz and Montenegro agreed to joint legal custody of Gregory, with Diaz having primary physical custody. When Gregory was to start kindergarten, however, they were

unable to resolve their differences and asked the trial court to modify its last stipulated custody order. After an adversarial hearing, the trial court awarded primary physical custody to Montenegro based on the "best interests" of the child. The Court of Appeal reversed, concluding that the trial court applied the wrong standard. Finding that two of the stipulated orders were final judicial custody determinations, the Court of Appeal held that the custody arrangement was subject to modification only if Montenegro established a significant change in circumstances. We now reverse and hold that the trial court properly applied the best interest standard, rather than the changed circumstance rule. ·

## FACTS

Montenegro and Diaz were unmarried when their son Gregory was born in November 1994. For the first 18 months after the birth, Montenegro had short visits with Gregory, usually in the home Diaz shared with her mother.

In March 1996, Montenegro visited Gregory while Diaz was at work and Gregory was in the care of his grandmother. Although Montenegro had made no previous arrangements with Diaz, he took Gregory for an overnight visit. After that incident, Diaz refused to allow visitation without a court order. Montenegro then filed a complaint and order to show cause to establish paternity and requested joint legal and physical custody. Diaz conceded paternity but sought sole physical custody of Gregory. She also sought child support and a restraining order preventing Montenegro from harassing her at home or work. The trial court referred them to family court services, including mediation counseling.

Montenegro and Diaz were both represented by counsel and initially stipulated to a temporary custody order after mediation. Under the order, Diaz retained physical custody and Montenegro had visitation rights that would increase by stages to one weekday a week and alternate weekends.

On September 30, 1996, the superior court entered another order, signed by the parents and their attorneys, captioned "Stipulation and Order to Show Cause for Judgment." The order stated that Montenegro was Gregory's biological father and that Diaz had "primary responsibility for the care, custody and control of the minor." The order included a detailed visitation schedule for Montenegro, specifying weekend and midweek visits, holiday visits on alternate years, and visits on alternate weeks in the summer "when [the] child reaches 5 1/2 years old." The order further provided that "[t]his stipulation covers all matters in dispute in this Order to Show Cause. This Order when signed is the formal Order. No further documents are necessary." The minute order, however, was virtually identical in form to the

previous temporary minute orders, and the end of the order contained a "Notice to Parties Without Attorneys" stating that "[t]his order, although temporary, shall remain in effect until further order of court."

Despite the September 30, 1996 order, several disputes concerning custody and visitation arose, which resulted in additional mediation and in orders that were, on their face, temporary. One of these temporary orders referred Montenegro and Diaz "to Dr. Bradbury for [a] co-parenting class."

On June 24, 1997, the trial court entered another stipulated order signed by the parents and their attorneys after both parents filed orders to show cause seeking to modify the custody arrangement. Prior to this stipulation, neither Montenegro nor Diaz claimed that the September 30, 1996 order was a final judgment as to custody. In the new stipulation, the parents agreed to joint legal custody. Diaz had "primary physical custody," and .Montenegro had "secondary physical custody." The order also included the following detailed visitation schedule: Montenegro had physical custody of Gregory on the first weekend of each month and twice weekly, on holidays in alternating years, and for week-long vacations in the summer and winter. His physical custody of Gregory amounted to approximately 12 out of every 28 days, and a nearly equal division of time during holidays. Although the June 24, 1997 order did not provide for further review, it never stated that it was a permanent custody order.

Not surprisingly, this order did not end the feuding as Montenegro and Diaz had a disagreement over Gregory's future school. As a result, Montenegro filed an order to show cause requesting that the June 24, 1997 order be modified to provide for joint physical custody, with Gregory living with each parent on alternating weeks. Diaz filed a responsive declaration indicating that a joint custody arrangement would not be feasible once Gregory began to attend regular school, and that it would be in his best interest to be with her. Although she argued that Montenegro had not made "the requisite showing of a 'change in circumstances' or that a change in custody would be 'in the best interests' of" their child, she did not contend that the June 24, 1997 order was a final judicial custody determination.

Trial commenced on August 4, 1999. At the outset, both parents agreed that the triggering event for the hearing was Gregory's impending enrollment in kindergarten and the need to choose his school. They also agreed that the current custody arrangement would no longer be appropriate once Gregory began kindergarten, because his new daily schedule would necessitate that he spend the majority of his time with one parent.

At trial, Montenegro argued that he should have sole physical custody of Gregory. Although he admitted that the situation had improved somewhat

since the June 24, 1997 order, he claimed that Diaz was still unwilling to share Gregory with him. She was also hostile to Laura, his new wife and the mother of his second child, and had referred to Laura, in Gregory's presence, in very derogatory terms. Diaz argued that she should have sole physical custody of Gregory. She denied that she was unwilling to share Gregory with Montenegro, but conceded that she had not given Montenegro medical information about Gregory, even though Gregory was frequently ill. She also admitted that she had not attended all court-ordered sessions with Dr. Bradbury, and that she had not attended previously arranged meetings concerning a childcare provider used by Montenegro. Dr. Bradbury testified that Diaz was "consistently quite hostile toward Mr. Montenegro and . . . appeared . . . to be unwilling to try to establish an amicable relationship." In contrast, Montenegro "was quite willing to extend himself and go to almost any length in order to maintain contact with his son and to make the relationship between himself and the mother an amicable one."

On September 10, 1999, the trial court issued a statement of intended decision. In the decision, the court acknowledged that the parents had previously entered into stipulated orders concerning custody. It, however, concluded that "[t]his is an initial trial on custody" and held that a showing of changed circumstances was not required for a change in custody. Because Montenegro was more willing to share Gregory, the court ruled that it was in "the best interests of Gregory . . . that he be in the primary physical custody of the father . . . ." Consistent with these rulings, the trial court entered an order awarding physical custody to Montenegro and visitation to Diaz on alternate weekends, alternate holidays, and, during the summer, alternate weeks.

The Court of Appeal reversed. Concluding that the September 30, 1996 and June 24, 1997 orders were final judgments as to custody, the court held that the trial court should have applied the changed circumstance rule described in *Burchard v. Garay* (1986) 42 Cal.3d 531, 534, 538, footnote 4 [229 Cal.Rptr. 800, 724 P.2d 486, 62 A.L.R.4th 237] (*Burchard*) and *In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 761 [76 Cal.Rptr.2d 717] (*Biallas*), rather than the best interest standard.[1] After reviewing the evidence presented at trial, the Court of Appeal determined that there was no evidence of a significant change of circumstances. Consequently, the court

---

[1]The Court of Appeal also declined to apply footnote 12 of *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 40 [51 Cal.Rptr.2d 444, 913 P.2d 473] (*Burgess*), which suggested that the changed circumstance rule does not apply when the parents have joint custody, because: (1) the instant case did not involve a move-away; and (2) Montenegro and Diaz did not have joint custody. Because we resolve this case on other grounds, we express no opinion as to these aspects of the Court of Appeal's rulings.

found that application of the changed circumstance rule likely would have yielded a different result.

We granted review.

## DISCUSSION

■ "The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test." (*Burgess, supra,* 13 Cal.4th at p. 32.) Under this test, we must uphold the trial court "ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*Ibid.*) In this case, the Court of Appeal held that the trial court abused its discretion by applying the best interest standard instead of the changed circumstance rule. We now reverse the Court of Appeal on the ground that the trial court properly applied the best interest standard. Because the trial court did not abuse its discretion by refusing to apply the changed circumstance rule, we do not consider whether the Court of Appeal erred in its application of this rule to the facts of this case.

Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child. The court and the family have "the widest discretion to choose a parenting plan that is in the best interest of the child." (Fam. Code, § 3040, subd. (b).)[2] When determining the best interest of the child, relevant factors include the health, safety and welfare of the child, any history of abuse by one parent against the child or the other parent, and the nature and amount of contact with the parents. (§ 3011.)

Although the statutory scheme provides for court determinations of custody and visitation, private resolutions are preferred. Thus, section 3170 requires mediation "[i]f it appears on the face of a petition, application, or other pleading to obtain or modify a temporary or permanent custody or visitation order that custody, visitation, or both are contested . . . ." The "purposes of [the] mediation proceeding" are: (1) "[t]o reduce acrimony" between the parties; (2) "[t]o develop an agreement assuring the child close and continuing contact with both parents that is in the best interest of the child"; and (3) "[t]o effect a settlement of the issue of visitation rights of all parties that is in the best interest of the child." (§ 3161.)

As part of this emphasis on nonadversarial resolutions of custody and visitation disputes, the Legislature has developed "standards of practice" for these mediations. (§ 3162.) These standards include "[p]rovision for the best

---

[2]All further undesignated statutory references are to the Family Code.

interest of the child and the safeguarding of the rights of the child to frequent and continuing contact with both parents." (*Id.*, subd. (b)(1).) The mediator "shall use his or her best efforts to effect a settlement of the custody or visitation dispute that is in the best interest of the child . . . ." (§ 3180.) Private counsel appointed to represent the child in the custody or visitation proceeding are "charged with the representation of the child's best interests." (§ 3151, subd. (a).)

If the mediation is successful and the parties reach an agreement, then the agreement must be submitted to the court for confirmation and incorporation into a court order. (§ 3186.) If, however, the mediation fails, then "the court shall set the matter for hearing on the unresolved issues." (§ 3185, subd. (a).) At the adversarial hearing, the court has " 'the widest discretion to choose a parenting plan that is in the best interest of the child' " (*Burgess, supra*, 13 Cal.4th at p. 31, quoting § 3040, subd. (b)), but "must look to *all the circumstances* bearing on the best interest of the minor child." (*Burgess*, at p. 31.)

Although the statutory scheme only requires courts to ascertain the "best interest of the child" (e.g., §§ 3011, 3020, 3040, 3087), this court has articulated a variation on the best interest standard once a final judicial custody determination is in place. Under the so-called changed circumstance rule, a party seeking to modify a permanent custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification. (*Burgess, supra*, 13 Cal.4th at p. 37.) According to our earlier decisions, "[t]he changed-circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest. The rule thus fosters the dual goals of judicial economy and protecting stable custody arrangements." (*Burchard, supra*, 42 Cal.3d at p. 535.)

In *Burchard*, we held that the changed circumstance rule applies "whenever [final] custody has been established by judicial decree." (*Burchard, supra*, 42 Cal.3d at p. 535, fn. omitted.) Our holding followed the majority of jurisdictions (*ibid.*), which applied the changed circumstance rule "regardless of whether the initial determination of custody resulted from the parents' agreement, from a default judgment, or from litigation." (Sharp, *Modification of Agreement-based Custody Decrees: Unitary or Dual Standard?*

(1982) 68 Va. L.Rev. 1263, 1265, fn. omitted (Sharp).) We also expressly disagreed with the minority of jurisdictions that applied the rule only when custody was determined by the court through an adversarial factfinding process. (See *Burchard*, at p. 535.) In doing so, we affirmed our earlier rejection of the minority standard in *In re Marriage of Carney* (1979) 24 Cal.3d 725, 731, footnote 4 [157 Cal.Rptr. 383, 598 P.2d 36, 3 A.L.R.4th 1028]. (*Burchard*, at p. 535, fn. 2.)[3] Our subsequent decision in *Burgess* further confirmed that the changed circumstance rule applied after any final "judicial custody determination." (*Burgess, supra*, 13 Cal.4th at p. 37.)

Following this line of reasoning in *Burchard* and *Burgess*, the Court of Appeal in *Biallas, supra*, 65 Cal.App.4th 755, rejected the father's argument that the changed circumstance rule did not apply because the trial court entered the permanent custody order pursuant to a stipulation between the parties. (*Id.* at pp. 760-761; see also *In re Marriage of Edlund & Hales* (1998) 66 Cal.App.4th 1454, 1466-1470 [78 Cal.Rptr.2d 671] [applying the changed circumstance rule to a request for modification of a stipulated permanent custody order].) Because *Burchard* and *Burgess* "did not question the legitimacy of judicial orders entered pursuant to parental agreement" (*Biallas*, at p. 761), the court concluded that the trial court was not "empowered to make a de novo determination" of the best interest of the child. (*Id.* at p. 762.)

Despite these precedents, Montenegro now contends that stipulated custody orders cannot be final judicial custody determinations for purposes of the changed circumstance rule absent a "judicial inquiry as to whether the agreement results in an actual custody arrangement that fosters the child's best interest." We disagree. Nothing in our statutes or case law supports this contention, and we see no basis for treating a permanent custody order obtained via stipulation any differently from a permanent custody order obtained via litigation. Indeed, Montenegro's proposed requirement contravenes the stated intent behind our custody statutes. The Legislature has adopted a comprehensive statutory scheme designed to promote the mediation of all custody disputes. In doing so, the Legislature has indicated a strong preference for resolving custody disputes *outside the courtroom* through parental stipulations, on the apparent belief that cooperation is more likely to produce a sound resolution than litigation. Making stipulated

---

[3]*Burchard*, however, rejected the argument that the changed circumstance rule applies in the case of an informal or de facto arrangement for custody, i.e., without a judicial order. "It is unworkable because . . . absent such a prior determination the courts have no established basis on which they can assess the significance of any change. And it is potentially harmful because it could compel the court to make an award inconsistent with the child's best interest." (*Burchard, supra*, 42 Cal.3d at p. 538, fn. omitted.)

permanent custody orders less binding than litigated permanent custody orders absent a judicial inquiry runs counter to this preference and would likely lead to instability in custody arrangements. (See §§ 3160-3164.)

Moreover, Montenegro's contention ignores the reality that most parents resolve their custody disputes by agreement rather than litigation. These parents presumably do so because they believe these stipulated arrangements are in the child's best interest. Indeed, most courts and commentators agree that parents can adequately determine and protect their children's best interests. (See Sharp, *supra,* 68 Va. L.Rev. at p. 1263; Mnookin & Kornhauser, *Bargaining in the Shadow of the Law: The Case of Divorce* (1979) 88 Yale L.J. 950, 957-958 (Mnookin).) Requiring a judicial inquiry similar to the inquiry courts make when a defendant pleads guilty in order to attain finality would burden courts and parties with unnecessary expense and delay. (See Sharp, at p. 1286.)

Although we conclude that stipulated custody orders *may* be final judicial custody determinations for purposes of the changed circumstance rule, we also recognize that many stipulated custody orders are not intended to be final judgments. Child custody proceedings usually involve fluid factual circumstances, which often result in disputes that must be resolved before any final resolution can be reached. Although the parties typically resolve these disputes through stipulations confirmed by court order, they often do not intend for these stipulations to be permanent custody orders. Indeed, these temporary custody orders serve an important role in child custody proceedings, and our statutory scheme expressly provides for them. (See, e.g., § 3061.) Because many parties would not enter into a stipulated custody order if a court might later treat that order as a final judicial custody determination, we must be careful in construing such orders. Otherwise, we may discourage these parties from entering into such stipulations.

With this in mind, we hold that a stipulated custody order is a final judicial custody determination for purposes of the changed circumstance rule only if there is a clear, affirmative indication the parties intended such a result. In adopting this holding, we recognize the reality that many family court litigants do not have attorneys and may not be fully aware of the legal ramifications of their stipulations. Because most trial courts " ' "rubber stamp" ' " stipulations in custody proceedings (*Burchard, supra,* 42 Cal.3d 531, 548 (conc. opn. of Mosk, J.)), our holding ensures that courts effectuate the *actual* intent of the parties when they entered into the stipulation without precluding them from making enforceable promises (Mnookin, *supra,* 88 Yale L.J. at p. 984 [observing that "the inability to make an enforceable promise may inhibit dispute settlement"]).

Applying this holding to the facts presented here, we conclude that neither the June 24, 1997 order nor the September 30, 1996 order constitutes a final judicial custody determination. Although these orders included detailed visitation schedules and did not provide for further hearings, they did not clearly state that they were final judgments as to custody. For example, the September 30, 1996 order, which did contain the words "for judgment" written by hand, also contained a notice stating that "[t]his order, *although temporary*, shall remain in effect until further order of Court." Although the notice ostensibly applied to parties without attorneys, its inexplicable inclusion casts the finality of the judgment into doubt. Meanwhile, the June 24, 1997 order never mentioned the words "final," "permanent" or "judgment." Finally, the minute orders confirming these stipulations resembled the minute orders confirming the parties' temporary stipulations. Thus, neither order contained a clear, affirmative indication that the parties intended it to be a final judicial custody determination.

In addition to the ambiguities in the orders themselves, the parties' conduct following the entry of these orders strongly suggests that they did not intend for these orders to be final judgments as to custody. Both Montenegro and Diaz regularly sought to modify these orders. During these modification proceedings, Montenegro never claimed that the stipulated orders were final judicial custody determinations and never argued that the changed circumstance rule applied. Although Diaz eventually argued that the changed circumstance rule applied, she did so on the basis that Gregory had lived with her since birth—and not because she had stipulated to a final judgment. In fact, at the hearing, Diaz's counsel argued that the stipulated orders had no "significance at all," and Diaz conceded that a new custody arrangement was necessary because Gregory was to start kindergarten. Under these circumstances, we will not second-guess the trial court's interpretation of its own orders, and conclude that the court correctly applied the best interest standard. Because the record amply supports the trial court's determination that Montenegro should have custody of Gregory, we affirm it under the deferential abuse of discretion standard.

In reaching this conclusion, we do not dismiss the arguments of various amici curiae who contend this court should reevaluate the changed circumstance rule in light of new developments in social science and child psychology and development. Although we agree that the changed circumstance rule should be flexible and should reflect the changing needs of children as they grow up, we need not reach this issue today because we conclude that the changed circumstance rule does not apply. Accordingly, we leave any review of the changed circumstance rule for another day.

## DISPOSITION

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., and Chin, J., concurred.