Filed 1/6/16  Marriage of Runge CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| In re the Marriage of THOMAS J. RUNGE and LINUO HE RUNGE. | C075169 |
| THOMAS J. RUNGE, | (Super. Ct. No. FL0900302) |
| Appellant, | |
| v. | |
| LINUO HE, | |
| Respondent. | |

Appellant father appeals from a modified judgment awarding respondent mother sole physical custody of their child.  The original judgment of dissolution awarded the parties joint physical and legal custody of the child.  Subsequently, the trial court granted mother's motion for sole physical custody.  Father appeals, claiming, among other things, that the mother failed to demonstrate a significant change of circumstances warranting a modification of the existing custody judgment.  We conclude that mother successfully established the existence of a significant change in circumstances, that the trial court's

1

determination was supported by substantial evidence, and that the court did not abuse its discretion in granting mother's motion.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Original Proceedings and Custody Order

The parties were married on March 17, 2007. The parties had one child together. The child was born in June 2008. The parties separated in November 2009.

On December 2, 2009, father filed a petition for dissolution of the marriage. Father sought legal and physical custody of the child, with visitation to be granted to mother as agreed upon by the parties. Father requested that mother enjoy only supervised visitation with the child, claiming that mother lacked the proper parenting skills to safely care for the child without supervision. According to father, mother attempted to discipline the child by spanking him when he was four to five months old, which resulted in child protective services involvement. Further, father claimed that mother allowed the child to play with sharp objects. He also claimed that, in November 2008, mother attempted suicide in the child's presence. Additionally, on November 19, 2009, mother was arrested for striking father's 80-year-old mother in the presence of the child. Mother faced charges of elder abuse and child endangerment according to father.

On December 11, 2009, mother filed a response and request for dissolution of marriage. She requested that "petitioner"[1] receive legal custody of the child, and that the parties share joint physical custody. Mother requested that father be granted supervised visitation. Mother acknowledged that domestic violence restraining/protective orders were in effect in both the Criminal and Family Courts in Plumas County.

---

[1] Father was petitioner in the case. It would not appear that mother actually intended to request that father receive legal custody of the child. In any event, this error has no bearing on any issue presented on this appeal.

2

According to minutes of a hearing on May 18, 2010,[2] the trial court awarded the parties joint legal and physical custody of the child. The court ordered that an existing visitation schedule was to remain in place. The court entered a judgment of dissolution, filed January 25, 2012. In a child custody and visitation order attachment, the court awarded the parties joint custody of the child.

**The Parties' Petitions to Modify the Custody Order to Sole Physical Custody**

On February 4, 2013, mother filed a request for an order modifying child custody and visitation. She sought sole physical custody of the child with visitation to father on the first, second, fourth, and fifth weekends each month. Mother stated that, in September 2013, the child would begin attending kindergarten. The child had attended Head Start, preschool programs, daycare, and a weekly library reading program in her community in Quincy. The child had made friends in these programs, with whom he also played soccer. Mother stated that it would be in the child's best interest to attend kindergarten in Quincy, where he had established relationships. She also stated that, to her knowledge, the child did not have friends in Reno, where father lived, and did not participate in any education or daycare programs there.

On March 4, 2013, father filed a responsive declaration, stating that he did not consent to the order requested by mother. He requested sole physical custody of the child, and an order permitting the child to attend school in Reno. Father claimed that Reno had educational advantages over Quincy. Father also asserted that he had more to offer the child in connection with his educational, athletic, and recreational development than mother. He emphasized that he had a driver's license, and claimed mother did not. Father also expressed "concern" over mother's immigration status in this country.

Father filed a supplemental responsive declaration on April 2, 2013. According to father, he had just retained counsel, and had been advised to make certain additional facts

_____

[2] The hearing was not transcribed.

3

part of the record. Father stated that, in November 2009, mother hit his "invalid mother as she sat helplessly in a wheel chair." Father called 911, and police arrested mother. Ultimately, mother was convicted of disturbing the peace. Father claimed that their child was still "bothered by the incident." Father further claimed that mother had subjected the child to "unwholesome" influences by enrolling him in preschool without father's consent. Father claimed, relying on a study,[3] that "no good has resulted from federally funded pre-school for the past 48 years." He further claimed that mother was in the United States illegally and stated that mother did not have a green card, passport, or driver's license. Given the lack of documentation, father claimed that mother could not be working "unless under the table." Therefore, according to father, "[i]t is difficult to imagine a less qualified and fit individual for custody than" mother. Finally, father stated that he had the opportunity to enroll the child "in [an] exceptional private school, the Montessori School in Reno."

On August 7, 2013, father's attorney filed an ex parte request for an order requiring mother to submit to a deposition, or, in the alternative, to continue trial in this matter for 60 days. Father's attorney indicated that mother, by letter, had declined his requests to depose her. Father's attorney also raised what he termed "major concerns" about mother's behavior. In discussing these concerns, father's attorney relied on handwritten notes prepared by father and his mother, describing instances of mother's allegedly erratic behavior. Father's attorney also discussed the incident wherein mother

---

[3] Father appended to his supplemental responsive declaration a copy of a January 10, 2013, article by Lindsey Burke and David B. Muhlhausen, Ph. D., of the Heritage Foundation, discussing the 2010 Head Start impact study, and an additional article by Burke dated February 12, 2013.

was charged with battery against person of elder or dependent adult (Pen. Code, § 243.25), and willful harm or injury to child (Pen. Code, § 273a).[4]

## The Hearing

### Father's Case[5]

Father testified that he lived in Sun Valley, Nevada, approximately 75 miles from Quincy. He had lived in Sun Valley for approximately three years, having lost his home in California. Following the parties' divorce, father could not afford the mortgage payments in addition to spousal and child support, necessitating his move. As of the time of the hearing, he was still "trying to make a comeback . . . " financially.

Father testified that, since the time of the court's custody order, he had the child with him approximately three and one-half days per week. When father had custody of the child and father was at work, father's fiancé, who lived with him, cared for the child. The daughter of father's fiancé also lived with them. The child had his own bedroom at father's house, and there was a backyard where the child could play.[6] According to father, his fiancé's daughter and the child got along very well. Father testified that he spent as much time as possible with the child and with his fiancé's daughter.

Father testified that he tried to work with the child on educational pursuits every day that he was with him. Father testified that he taught the child about cooking, astronomy and the night sky, auto mechanics, biology, sports, and swimming. While father had not yet taken the child camping, he was teaching the child about the skills required to go camping. He also read to the child regularly. When asked on cross-

---

[4] Father's attorney annexed the criminal complaint, filed November 23, 2009, with his request.

[5] For a procedural reason not relevant here, father presented his case first.

[6] As exhibits, father submitted a number of photographs of the house and the child at the house.

5

examination about the fact that father had not enrolled the child in swimming lessons, as mother had done in Quincy, and that he had not enrolled the child in sports leagues, father responded that he preferred to teach his son and play with his son personally rather than having others do so.

With regard to discipline, father testified that he reasoned with the child, and explained what was right and what was wrong. According to father, even at his young age, the child had a good understanding of right and wrong.

Father testified that he researched schools in the Sparks area. Specifically, he looked into a school named Alice Taylor. According to father, Alice Taylor was rated higher than the school in Quincy. However, father did not speak with the kindergarten teacher at that school about kindergarten classes or opportunities. He also acknowledged on cross-examination that the Alice Taylor School was not in his school district. Father also researched a Montessori school. There, he spoke with a first-grade teacher. He also had a conversation via e-mail with a kindergarten teacher at the Montessori school. Father had a very favorable impression of her. Additionally, according to father, the teacher was very impressed with the child and hoped to have the child in her class. Father testified that the kindergarten class at the Montessori school was considered to be a public kindergarten, and thus it was offered free of charge. Father testified that mother never consulted him about having the child attend preschool.

Father testified that he had a driver's license and a registered vehicle that was insured. On cross-examination, he admitted that he had been unaware that mother had obtained a driver's license.

With regard to the existing custody and visitation arrangements, father testified that there were occasionally problems. He referred to an instance when he had to attend mediation in order to enforce certain days which were owed to him. He discussed another occasion when he had to pick the child up late, and mother threatened to make father wait until midnight to take the child, acting with some hostility towards father.

6

Additionally, father discussed an exchange in Portola when mother arrived in a county-owned van accompanied by a social worker.

Father testified that the child received immunizations without his knowledge or consent. The child was also taken to a mental health counselor without father's knowledge. On cross-examination, father acknowledged that he did not know whether the child had a regular physician in Quincy. He further testified that he had not taken the child to the doctor for any purpose. He acknowledged that mother had taken the child for his checkups and required immunizations.

Father testified that, if the court granted his request for custody, he would still accommodate visitation with mother.

Father's sister, Michelle Catorette, testified that she had observed father with the child on a number of occasions. Catorette observed father teaching the child "all kinds of things." She testified that the child's vocabulary was "wonderful," and father always answered the child's questions with intelligence. Catorette had no concerns about father's ability to parent the child.

### Mother's Case

Mother testified that she lived in Quincy with the child, who was five years old. Mother sought a change in custody because she wanted to enroll the child at the Pioneer/Quincy Elementary School in Quincy. She had filled out all of the necessary forms, taken the child to the school, and introduced him to the schoolteacher. She had also taken the child to a program called "Kindergarten Round-up." Some of the child's friends would go to the same school. The school was within walking distance from mother's house, less than five minutes away. Mother wanted the child to attend school where he would be comfortable and familiar with the surroundings, and where he had friends from preschool and daycare.

The child had attended preschool in Quincy from 8:30 a.m. to 3:00 p.m. Mother testified that the child had good friends at preschool and daycare. On cross-examination,

mother testified that she did consult father about enrolling the child in preschool, and about enrolling him in elementary school.

During the time when the child was in her care, mother took the child to the park, took him on picnics, and took him to swimming lessons. After swimming lessons, mother would swim with the child, although she acknowledged on cross-examination that she "can't swim too far." Mother also took the child to the library for story time, where he would see friends. Mother enrolled the child in soccer. Some of the child's friends participated, and he enjoyed the experience. Mother also took the child to the farmers' market and the fair.

Mother testified that she was the person who took the child to his doctor's appointments. The child was up to date on his immunizations. She testified that she kept father informed about the child's medical appointments, and consulted him about immunizations.

Mother testified that she worked cleaning the Social Service building for Bob's Janitorial in Quincy. She had been employed in this capacity for two years. She had another job as well, working for a dentist. She had this position for approximately six months. Mother testified that she did have a California driver's license, and she owned a car. On cross-examination, mother testified that she worked for the janitorial service 20 hours per week. She worked approximately four hours on weekend days. When mother had the child but she was working, the child went to daycare. Mother also testified that she was taking college classes during the time when the child went to preschool. Additionally, she testified that she would likely have to hire someone with whom the child was comfortable to watch him two nights each week while she worked.

Mother said she had certain concerns if the court were to grant physical custody to father. She testified that father spoke ill of her to the child. She testified that, when the child would return from time with father, the child would say, "Daddy don't like you," "I have [an]other mother," and "[m]y dad will call the cop[s] on you." However, mother

8

stated that she believed the child should spend time with father, and that the child would benefit from spending time with both parents. She testified that, if she were granted custody, she would facilitate visitation with father, and would allow telephone communication during the week. She also testified that she was agreeable to the idea of father having the child for as many as three weekends during the month.

**The Trial Court's Decision**

Following argument from both attorneys, as the court began to render its decision, father's attorney stated that he wished to submit a trial brief summarizing the case. The trial court judge declined to receive father's trial brief.

The trial court observed that the child needed to be with one parent or the other because he was about to begin attending school. The court said that there were two adequate parents involved, and the child was not suffering in either parent's home or from the custody exchanges. The court did indicate it was troubled by the testimony concerning father speaking ill of mother. However, the court reiterated that there was no indication the child was having difficulty in either home. The court then noted that the child had been attending preschool and daycare while with mother in Quincy. The court found this tipped the balance in favor of having the child remain with mother in Quincy. In this regard, the court emphasized that the child had developed relationships with other children in the community. The court opined that the schools in the two parents' communities were equivalent academically.

At this point, father's attorney interrupted the court to request a statement of decision. The court told counsel he was "a little late" in making such a request. Counsel stated that the request was set forth in his trial brief, which the court had not accepted. The court nonetheless stated that it was too late since it was rendering its decision.

The trial court continued, ruling that it would allow mother to have the child during the school week. The court stated that it would grant father the first, second,

fourth, and fifth weekends of each month.  Father's attorney then requested that father be granted every weekend, but the court denied that request.

## The Trial Court's Order

In an order filed September 13, 2013, the trial court granted mother physical custody of the child, and directed that the parties would share joint legal custody.  The court directed that the child be enrolled in and attend Pioneer/Quincy Elementary School in the Plumas Unified School District beginning September 4, 2013.  The court directed that, effective September 3, 2013, father was to have liberal visitation with the child, consisting of the first, second, fourth, and fifth weekends of each month, beginning on Friday evenings and ending on Sunday evenings.  Father was also to have the right to telephone visitation with the child when the child was in mother's care.  The court also specified that all other orders not otherwise modified were to remain in full force and effect.

## DISCUSSION

### I.  Change of Circumstances Warranting Modification of Prior Judgment

#### A.  The Parties' Contentions

Father contends that the trial court abused its discretion in granting mother's petition for a change in custody.  According to father, mother failed to demonstrate a significant change in circumstances warranting the change in custody.[7]  Father claims that the mere fact that the child had achieved school age was not sufficient to establish a

---

[7] Mother's contention that father cannot raise, for the first time on appeal, his argument that she failed to demonstrate a significant change in circumstances is without merit.  We conclude, *post*, that, in support of her motion, mother had the burden to demonstrate a significant change in circumstances warranting a change in custody.  Because this was mother's burden on her motion, which father opposed, father is not foreclosed from asserting on appeal that she failed to meet this burden notwithstanding the fact that, before the trial court, father did not explicitly refer to this burden cast in these precise terms (nor, for that matter, did mother).

10

significant change in circumstances to satisfy this test.  We conclude that the trial court did not abuse its discretion in granting mother's application for a modification in custody and visitation, awarding her physical custody of the child.  We conclude that mother demonstrated a significant change in circumstances warranting the modification, and the trial court's determination in this regard is supported by substantial evidence.

### B.  Standard of Review and Requisite Showing

" 'The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test.' " (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 (*Montenegro*), quoting *In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32 (*Burgess*).) "We are required to uphold the ruling if it is correct on any basis, regardless of whether such basis was actually invoked." (*Burgess*, at p. 32, citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329.)  To the extent father challenges the trial court's factual findings, our review is limited to whether any substantial evidence, contradicted or uncontradicted, supports the trial court's ruling.  (*Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289, 300 (*Chalmers*).)  "We resolve conflicts in evidence in favor of the prevailing party and draw all reasonable inferences to uphold the trial court's decision." (*Ibid.*, citing *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 (*Mix*).)

The parties disagree on the standard applicable on mother's petition for a modification in custody and visitation.  Father contends, primarily, that it was incumbent upon mother, in support of her motion, to establish a significant change of circumstances warranting a change in custody.  Mother responds that, because this matter involved merely a change in the parenting schedule, as opposed to a change in custody, she was only required to demonstrate that the best interest of the child required modification of the custody order.  We agree with father.

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child." (*Montenegro*,

*supra*, 26 Cal.4th at p. 255.)  Family Code section 3087[8] states, in part:  "An order for joint custody may be modified or terminated upon the petition of one or both parents or on the court's own motion if it is shown that the best interest of the child requires modification or termination of the order."  "When determining the best interest of the child, relevant factors include the health, safety and welfare of the child, any history of abuse by one parent against the child or the other parent, and the nature and amount of contact with the parents." (*Montenegro*, at p. 255, citing § 3011.)

"Although the statutory scheme only requires courts to ascertain the 'best interest of the child' (e.g., §§ 3011, 3020, 3040, 3087), [the California Supreme Court] has articulated a variation on the best interest standard once a final judicial custody determination is in place." (*Montenegro*, *supra*, 26 Cal.4th at p. 256.)  "Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement.  [Citation.]  In recognition of this policy concern, [the California Supreme Court] ha[s] articulated a variation on the best interest standard,  known as the changed circumstance rule, that the trial court must apply when a parent seeks modification of a final judicial custody determination.  [Citation.]  Under the changed circumstance rule, custody modification is appropriate only if the parent seeking modification demonstrates 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest.  [Citation.]  Not only does this serve to protect the weighty interest in stable custody arrangements, but it also fosters judicial economy.  [Citation.]" (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956 (*Brown & Yana*).)  " 'The changed-

---

[8] Further undesignated statutory references are to the Family Code.

circumstance rule is not a different test, devised to supplant the statutory test, but an adjunct to the best-interest test. It provides, in essence, that once it has been established that a particular custodial arrangement is in the best interests of the child, the court need not reexamine that question. Instead, it should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest[s].' " (*F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 15, quoting *Burchard v. Garay* (1986) 42 Cal.3d 531, 535 (*Burchard*).) The changed circumstances to be demonstrated under this test must be substantial; a change in custody will not be authorized " ' "unless the material facts and circumstances occurring subsequently [to the initial custody judgment] are of a kind to render it essential or expedient for the welfare of the child that there be a change." ' " (*Burgess*, *supra*, 13 Cal.4th at p. 38; *Washburn v. Washburn* (1942) 49 Cal.App.2d 581, 588.) The California Supreme Court has acknowledged that "the changed circumstance rule should be flexible and should reflect the changing needs of children as they grow up . . . ." (*Montenegro*, at p. 259.) Of course, the burden of showing a significant change of circumstances is on the party seeking the change of custody. (*In re Marriage of Carney* (1979) 24 Cal.3d 725, 731 (*Carney*).)

The applicability of these different tests under differing circumstances makes sense. Where the court is charged with determining custody and visitation matters at the outset, the statutory mandate, and overriding interest, is the best interest of the child. The changed circumstances rule "promotes stability by preventing the reexamination of final judicial determinations of custody in the absence of 'some significant change in circumstances . . . .' " (*Enrique M. v. Angelina V.* (2004) 121 Cal.App.4th 1371, 1382 (*Enrique M.*), quoting *Burchard*, *supra*, 42 Cal.3d at p. 535.) Thus, only where a change in a pre-existing judicial custody determination is contemplated, which may prove disruptive to those concerned and will undermine judicial economy and finality (see generally *Brown & Yana*, *supra*, 37 Cal.4th at p. 956), is it necessary for a litigant to

13

demonstrate a significant change in circumstances from those which gave rise to the original custody determination.

Where parents share joint physical custody, *modification of the co-parenting arrangements* does not necessarily constitute a change in custody for which the petitioning party must demonstrate a significant change in circumstances. (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 363 (*Niko*).) "The changed circumstance rule applies to a modification request seeking a change in a final determination of custody. The changed circumstance rule does not apply to a modification request seeking a change in the parenting or visitation schedule." (*In re Marriage of Lucio* (2008) 161 Cal.App.4th 1068, 1077, fn. omitted.) For example, in *Niko*, a majority of the court, determined that the mother of the child, who petitioned to modify the custody arrangement seeking permission to relocate to Colorado with the child, failed to meet her burden of demonstrating a significant change in circumstances. (*Niko*, at p. 362.) However, the *Niko* majority further stated that reversal of the trial court's order, which modified the prior judgment and established a new coparenting plan, was not required because the court did not actually change custody of the child. (*Id*. at pp. 348, 362.) Instead, while granting the mother permission to move to Colorado with the child, the court "continued joint custody with a modified coparenting arrangement." (*Id*. at p. 362.) The majority in *Niko* determined that the trial court properly made a de novo determination of the child's best interests. (*Id*. at pp. 362-364.) The dissent in *Niko* concluded that, where the mother was proposing to move out of state with the child, the result would indeed constitute a modification of the final judgment of custody, and the mother therefore should have been required to satisfy the changed circumstances test. (*Id*. at pp. 371-372 (dis. opn. of Bedsworth, J.).)

Here, mother explicitly petitioned for an order modifying *child custody* and visitation. Where previously the parties shared joint legal and physical custody, on her motion, mother expressly sought "sole physical custody . . . ." (Cf. *Enrique M.*, *supra*,

14

121 Cal.App.4th at p. 1382 [petitioner's request to alter parenting schedule and the child's school situation did not amount to a request to modify the joint custody arrangement; petitioner did not check box indicating desire to modify custody on the order to show cause, and the requested scheduling changes were not on par with a request to change physical custody].)  Also, crucially, unlike the trial court in *Niko*, in the order appealed from here, the court expressly granted a change in custody, granting mother's request for physical custody of the child.  (See generally *Carney*, *supra*, 24 Cal.3d at p. 731 [request for a change of custody is addressed in the first instance to the sound discretion of the trial judge; trial judge must exercise that discretion in light of the applicable important policy considerations].)  " '[S]ole physical custody[]' . . . means the child 'shall reside with and be under the supervision' of the custodial parent, 'subject to the power of the court to order visitation' for the noncustodial parent." (*Brown & Yana*, *supra*, 37 Cal.4th at p. 956, quoting § 3007.)  Thus, the court here did not merely continue the existing joint custody order with a modified coparenting arrangement.  (Cf. *Niko*, *supra*, 144 Cal.App.4th at p. 362.)  Instead, the trial court explicitly ordered a change in custody, as specifically requested by mother.

Accordingly, we agree with father that the mother bore the burden of demonstrating a significant change in circumstances to justify a change in custody.

### C.  Analysis

#### 1.  Significant Changed Circumstance

While the parties disagree about mother's burden on her motion and on the actual import of the order from which defendant appeals,[9] the parties appear to agree that the principal change in circumstances at issue here is that the child has attained school age.

---

[9] Father correctly observes that the order granted a change in custody, awarding physical custody to mother.  Mother, for her part, inconsistently characterizes the order.  At one point, mother claims that the order merely "change[d] the parenting schedule," while at another point, she acknowledges that the order awarded her custody of the child.

15

As such, he must begin attending school. Given the distance separating the parties' homes, it is not feasible for the child to split time between the parents during the school week. As a result of the child attaining school age, mother petitioned for sole physical custody of the child so that the child could attend school in Quincy. Father cross-petitioned for custody of the child so that the child could attend school in Reno (Sun Valley), Nevada.

We conclude that it was not an abuse of discretion for the trial court to conclude that the fact that the child had attained school age constituted a significant change in circumstances justifying a modification of the pre-existing final judicial custody determination. (See generally *Montenegro*, *supra*, 26 Cal.4th at p. 256; *Burchard*, *supra*, 42 Cal.3d at p. 535.) While it certainly cannot be said that the child attaining school age was an *unanticipated* change in circumstances, such is not the standard in applying the changed circumstances test. As the trial court observed, particularly given the circumstances of this case including the distance between the parties' residences, during the school week, "[t]he child needs to be with one parent or the other because that child is now entering school." We disagree with father's contention that this could not constitute a significant change in circumstances warranting a change in the final custody determination.

### 2. Substantial Evidence Supporting the Modified Custody Order

Father also contends, in effect, that substantial evidence did not support the trial court's factual determination to grant mother's motion to award her custody so that the child could attend school in Quincy. We disagree.

Preliminarily, we note that father's appellate briefing suggests a fundamental misunderstanding as to the scope of our review.[10] On appeal, we are not authorized to

---

[10] For example, father asserts the evidence "overwhelmingly suggests that [the child] should go to school in the community where his father lives so that his father can prepare

16

reweigh the evidence or to substitute our judgment for that of the trial court. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319 (*Stephanie M.*).) We must resolve all conflicts in evidence in favor of mother and draw all reasonable inferences to uphold the trial court's determination. (*Mix*, *supra*, 14 Cal.3d at p. 614; *Chalmers*, *supra*, 213 Cal.App.4th at p. 300.)

Mother wanted their child to attend school in Quincy where he had friends from preschool and daycare, and where he would be comfortable and familiar with the surroundings. The school was within walking distance from mother's house. Mother had already taken the child to a program called "Kindergarten Round-up" and had introduced him to the teacher.

Mother was working, had a California driver's license, and owned a car. She arranged for the child to go to daycare if she was still working when he got out of preschool. Additionally, mother would likely hire someone with whom the child was comfortable to watch him two nights each week while she worked. Mother testified that she was the person who took the child to his doctor's appointments. The child was up to date on his immunizations.

When the child was in her care, mother took him to the park, to swimming lessons, and on picnics. Mother enrolled the child in soccer, in which some of his friends participated. Mother also took the child to the farmers' market and the fair.

Mother stated that she believed the child should spend time with father, and that the child would benefit from spending time with both of his parents. She testified that, if she were granted custody, she would facilitate visitation with father, and would allow telephone communication during the week. She also testified that she was agreeable to the idea of father having the child for as many as three weekends during the month.

---

him for a lifetime of demands." Apparently, father would have us ignore the evidence supporting the trial court's decision.

For his part, father testified that, when the child was in his care but he was at work, his fiancé cared for the child. The child had his own bedroom at father's house, and there was a backyard where he could play. According to father, his fiancé's daughter and the child got along very well. Father testified that he spent as much time as possible with the child and with his fiancé's daughter.

Father testified that he tried to work with the child on educational pursuits every day. Father helped the child learn to swim. Father also taught the child about cooking, astronomy and the night sky, auto mechanics, biology, and sports. Father was teaching the child about camping and the skills required to go camping. He also read to the child regularly.

Father testified that he researched schools in the Sparks area. Specifically, he looked into a school named Alice Taylor. According to father, Alice Taylor was rated higher than the school in Quincy, although he acknowledged that it was not in his school district. Father also researched a Montessori school. Father testified that the kindergarten class at the Montessori school was considered a public kindergarten, and thus it was offered free of charge.

Father testified that he had a driver's license and a registered, insured vehicle. Father testified that, if the court granted his request for custody, he would still accommodate visitation with mother.

We conclude that substantial evidence supports the trial court's determination, granting mother's motion for a change in custody. (See generally *Chalmers*, *supra*, 213 Cal.App.4th at p. 300.) As the trial court acknowledged, this matter presented a "difficult decision," and the court was required to weigh the testimony from "two good adequate parents . . . ." The court opined that the child was happy and well-adjusted during his time in each parent's home. The court also opined that the schools in each location were comparable. However, ultimately, the court was persuaded by the fact that the child had been attending preschool, daycare, and other programs in Quincy while with mother, and

18

he had fostered relationships with children there, some of whom would be classmates at school. Resolving all conflicts in evidence in favor of mother and drawing all reasonable inferences to uphold the trial court's determination (*Mix*, *supra*, 14 Cal.3d at p. 614; *Chalmers*, at p. 300), we conclude that the court's determination was supported by substantial evidence. As we have said, we are not authorized to reweigh the evidence or to substitute our judgment for that of the trial court. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 319.)

### 3. Conclusion - Modification of Custody

Accordingly, we conclude that, contrary to father's contention, the trial court did not abuse its discretion in granting mother's petition for custody. We conclude that mother satisfied the applicable burden of demonstrating a significant change in circumstances which warranted the change in custody. Moreover, we conclude that substantial evidence supported the trial court's determination.

### II. Father's Additional Contentions

Father advances several additional contentions which we need only address briefly.

First, father claims that, in the alternative to the changed circumstances analysis, the trial court should have undertaken a de novo custody determination with all attendant procedures, permitting the parties, among other things, to engage in plenary discovery proceedings. However, as we have said, the applicable standard on mother's motion was whether she established a significant change of circumstances warranting modification of the final custody determination. Thus, father's contention that the trial court should have employed a different procedure is without merit.

Second, father asserts that the trial court erred in failing to issue a statement of decision, and that this error constituted per se reversible error. We decline to address this issue because father improperly raised it for the first time in his reply brief on appeal. (*Varjabedian v. Madera* (1977) 20 Cal.3d 285, 295, fn. 11 [obvious reasons of fairness

19

militate against consideration of an issue raised initially in the reply brief of an appellant]; *Neighbours v. Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [the rule is that points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before].)  While father did *refer* in his opening brief to the trial court's denial of his request for a statement of decision, he did not claim in his opening brief that this was error, or that it was reversible error. Moreover, in his opening brief, father did not state this claim "under a separate heading or subheading summarizing the point," or support that claim "by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).)  Thus, father also forfeited this argument by his failure to comply with California Rules of Court, rule 8.204(a)(1)(B).  (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 656 [appellant must present each point separately in the opening brief under an appropriate heading, showing the nature of the question to be presented and the point to be made; otherwise, the point will be forfeited]; *Opdyk v. California Horse Racing Bd.* (1995) 34 Cal.App.4th 1826, 1830, fn. 4 [appellant must present each point separately in the opening brief under an appropriate heading or it is forfeited].)[11]

Third, father inconsistently claims that the trial court should have characterized mother's motion as one for a modification of the visitation schedule.  However, mother moved, inter alia, for a change in custody, and, as we conclude here, the trial court did not abuse its discretion in granting mother's motion in this regard.  We conclude that

---

[11] By motion filed on May 18, 2015, father moved, inter alia, to augment the record to include his trial brief.  Father seeks to augment the record with his trial brief to establish that he timely requested a statement of decision.  However, as discussed above, father forfeited his contention concerning the trial court's denial of his request for a statement of decision.  Thus, the timeliness of his request for a statement of decision, whether he tendered such a request in his trial brief, and his trial brief itself, are not relevant to any issue properly before us on this appeal.  Accordingly, we deny father's motion to augment the record.

20

father's claim that the trial court erred in not deeming mother's motion as one for a modification of the visitation schedule is without merit.

## DISPOSITION

The court's order granting mother's motion for a change of custody is affirmed, and mother shall recover her costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                           MURRAY            , J.


We concur:


        BLEASE            , Acting P. J.


        ROBIE            , J.