Filed 4/26/23  Marriage of Fletcher and Berquist CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re the Marriage of MICHAEL FLETCHER and LIA BERQUIST-FLETCHER. | B317379 (Los Angeles County Super. Ct. No. ND070627) |
| MICHAEL FLETCHER, Appellant, v. LIA BERQUIST, Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Joseph M. Lipner, Judge.  Reversed.

Michael Fletcher, in pro. per., for Appellant.

No appearance for Respondent.

————————————

Michael Fletcher appeals from the family court's postjudgment order granting in part Lia Berquist's request for order modifying custody (RFO), awarding her sole legal custody of their then-13-year-old daughter Callista for the limited purposes of obtaining a passport and ensuring Callista attends counseling with a therapist. Fletcher contends the family court erred in denying his request to cross-examine Berquist at the hearing, and further, Berquist failed to serve her RFO and supporting exhibits on him. Fletcher also argues there was no change in circumstances to support modification of custody in favor of Berquist because, according to Fletcher, Berquist physically assaulted Callista in April 2021. We agree with Fletcher's first contention—the family court erred in denying Fletcher's request to cross-examine Berquist. We reverse and remand for the court to hold an additional evidentiary hearing at which each party may cross-examine the other party.

**FACTUAL AND PROCEDURAL BACKGROUND**

A. *The Marital Dissolution*

A judgment dissolving Berquist and Fletcher's marriage was entered on June 8, 2016 after a trial on reserved issues.[1] The judgment included final orders for custody and visitation, awarding the parents joint legal and physical custody of their two daughters, Cressida (now an adult) and Callista. The parenting plan provided roughly equal parenting time, with Callista residing with Fletcher from Sunday morning until Wednesday or

---

[1] Judge Michael J. Convey entered the judgment of dissolution and final custody order.

2

Thursday morning during the school year, and shared holidays and vacations.

On August 16, 2018 the trial court[2] granted Berquist's request for a three-year domestic violence restraining order (DVRO) requiring Fletcher not to contact Berquist and to stay at least 100 yards away from Berquist and her home, vehicle, workplace, and school, except for brief and peaceful contact to effectuate custody transfers.

B.    *Berquist's Request To Modify Custody*

On July 13, 2021 Berquist filed an RFO seeking modification of the family court's judgment on custody and visitation, to award her sole legal custody of Callista and physical custody and visitation "as determined by [the] court," in light of Fletcher's alleged refusal to allow Callista to live with Berquist.[3] On the RFO form, Berquist attested that Fletcher "frequently removes Callista from an after school program on [Berquist's] days, interfering with [Berquist's] ability to make plans for and with [Callista]," and when Berquist notified Fletcher of dates in September 2021 when she wanted to take Callista on vacation,

---

[2]    Judge Joseph Lipner entered the 2018 domestic violence restraining order and presided over this matter through the filing of this appeal.

[3]    Fletcher's designation of the record on appeal omitted the RFO.  On our own motion we augment the record to include the following documents filed in the family court: (1) Berquist's July 13, 2021 RFO; (2) Berquist's July 13, 2021 request to renew the 2018 DVRO; (3) the family court's October 5, 2021 minute order continuing the hearing on the RFO; and (4) Berquist's October 14, 2021 supplemental declaration in support of the RFO.  (Cal. Rules of Court, rule 8.155(a)(1)(A).)

3

Fletcher "refused and threatened to 'keep' the child from [Berquist]."

In her supporting declaration, Berquist averred Callista had been living almost exclusively with Fletcher for the past three months following an incident on Saturday, April 10, 2021. On that date, Callista was staying with Berquist but was unhappy because she had been grounded. Callista called Fletcher and asked him to pick her up. Berquist told Callista and Fletcher she could not go with him, and Berquist wanted Callista "to calm down and for us to have a rational conversation before she left." Instead, according to Berquist, Fletcher "told [Callista] that I was holding her 'hostage' and that if I did not let her leave, he was going to call 911. He called the police who came to my home. The police determined that Callista was not in danger and had not been physically abused. When the police left, [Fletcher] was waiting outside my home about 50 yards from my front door . . . . Callista ran from my house into his car. He took her to his home. He has not returned her since and has not encouraged her to come home."

Berquist declared that after the April 10 incident, Callista would randomly visit with Berquist and joined Berquist on a trip to visit Callista's maternal grandparents in June 2021, but she refused to live in Berquist's home. Berquist believed Fletcher was "intentionally alienating" Callista, and further, there were "historical behaviors where he speaks poorly of me and pits my children against me." Berquist made an appointment for Callista to see a therapist in June 2021, but Callista was sick on the day of the appointment, and Fletcher did not bring her to a rescheduled appointment. Berquist did not trust Fletcher to make decisions for Callista, and since April 2021 Fletcher had not taken Callista to the doctor, dentist, or therapist, and had

missed two orthodontic appointments. Berquist stated, "I don't want to force [Callista] against her will to live in my home. However, I don't want to just let her go because I fear that she is being emotionally abused at her father's and might be making decisions under duress."

On July 13, 2021 (the same day she filed the RFO), Berquist filed a request to renew the 2018 DVRO. Fletcher did not file a responsive declaration to the RFO or to the request to renew the DVRO. Instead, on October 5, 2021 (the date originally noticed for a hearing on both of Berquist's requests) Fletcher filed a request for order seeking to modify guideline child support to recognize that Callista now resided with him 95 percent of the time. Fletcher's request stated, "On April 13, 2021[4] [Berquist] assaulted Callista . . . and refused to allow Callista to leave which required me to call 911. Once the police opened the door Callista ran from [Berquist's] apartment and refused to return because of her mother's physical abuse. Since that day Callista has resided with me 95% of the time. Under California law [Berquist] cannot have custody and may only have supervised visitation and must pay child support . . . ." Fletcher also requested an order quashing Berquist's RFO on the ground Berquist failed properly to serve the RFO. On October 5, 2021 the family court, on its own motion, continued the hearing on Berquist's RFO and her request to renew the DVRO to November 8, 2021. The court's October 5 minute order on Berquist's RFO reflects that Fletcher was "served in open court by the deputy sheriff with a full and complete copy of the Request for Order re

---

[4] We assume Fletcher was referring to the incident on Saturday, April 10, 2021. There are no allegations or evidence of a separate incident on Tuesday, April 13, 2021.

5

Modification of Custody and Visitation filed by Petitioner on July 13, 2021."

On October 14, 2021 Berquist filed a supplemental declaration in support of her RFO in which she alleged Fletcher was alienating Callista from her, manipulating and neglecting Callista, and refusing to coparent. Berquist stated Callista's behavior had "change[d] dramatically" since April 2021, and Callista "has almost no respect for me or my house rules" or for teachers and other authority figures. Callista had a new habit of criticizing Berquist, telling Berquist she was "'mean,'" and expressing disdain for maternal relatives. Berquist wanted to obtain a passport for Callista so Berquist could take her on a vacation with Berquist's family, but Fletcher refused to sign the passport paperwork.

Berquist attached multiple screenshots of Callista's text message exchanges with Fletcher. In one message sent in December 2019, Callista asked Fletcher to sign her passport application, and he responded, "You are going [nowhere] with those people . . . now you are grounded and no texting[.]" In January 2020 Fletcher wrote, "Listening to your mother is going to hurt u." In February 2021 Callista asked Fletcher, "Am I gonna be able to bring my phone to ur house[?]," and she added, "I promise I won't call my mom or text her a lot." Fletcher responded, "Do u promise[?]" When Callista agreed, he stated, "I will trust u," and he allowed her to bring her phone.

C. *The Hearing on the RFO*

At the hearing on the RFO on November 8, 2021, Berquist requested sole legal and physical custody of Callista. Berquist testified there were no problems with Callista's behavior before the April 10, 2021 incident, but since that time Fletcher

6

manipulated Callista's feelings about spending time at Berquist's home and "instill[ed] fear in anything that [didn't] serve him." Fletcher also made health-related decisions for Callista without consulting Berquist, and he would not cooperate in taking Callista to therapy. Although Berquist was able to bring Callista to a court-approved therapist on three occasions, Callista had learned to "[work the] system" by going to Fletcher's home to avoid appointments. Fletcher also refused to allow Callista to obtain a passport. Berquist hoped to take Callista to Mexico for a family vacation, but Fletcher refused.

Fletcher testified that Berquist physically attacked Callista on April 10, 2021,[5] kicking her in the stomach. Fletcher received calls from Callista "screaming, saying her mother will not allow her to leave." Fletcher called 911, and the police sent a police officer to Berquist's door. Callista "got up and ran for her life" to Fletcher's car, which he had driven to Berquist's house. Fletcher testified there was police body camera footage showing Callista screaming and crying in his car. He represented that "[i]n that police report—I think it is page 8—the officer testifies that [Berquist] kicked my daughter in the stomach."[6]

---

[5] Fletcher testified the incident occurred on April 2, 2021, but we assume Fletcher was referring to the April 10 incident.

[6] The family court asked Fletcher if the court received the police report, and Fletcher responded it was attached to the RFO. The report was not attached to the RFO, but it was attached to Berquist's request to renew the DVRO. In the police report, the officer does not state that Berquist kicked Callista. To the contrary, Berquist made a statement to the police officer that Callista "became physical with me & kicked me in the stomach & knee" when she told Callista she was about to lose her phone.

7

Fletcher testified that after the April 10 incident, Callista remained with Fletcher "100 percent of the time," and Fletcher "had to pay her to go" to Berquist's house. Fletcher never prevented Callista from living with Berquist and even "begged her to go be with her mother," but Callista was "afraid of her mom." Fletcher argued the "status quo" for custody was that he had custody of Callista 95 percent of the time, and Berquist "has no contact with [Callista] other than when I make her go see her mother one night a week." Fletcher argued, "you can't change a custody order based upon her attacking my daughter."

The family court asked Fletcher to address "all these sad texts between you and your daughter where it says things like . . . [']Please, can I have my Phone? I won't call mom.[']" Fletcher responded Berquist had cherrypicked his messages to paint an incomplete picture. Fletcher also testified he had not been an impediment to therapy; rather, he went to the therapist and begged the therapist to see Callista but the therapist told him Berquist was lying (presumably about Callista resisting seeing the therapist). As to Berquist's request to obtain a passport for Callista, Fletcher testified Callista "doesn't have a passport because she wasn't going to go with [Berquist] anywhere," and as an abuser, Berquist had "no say" under the law to request additional custody.

After hearing the parties' testimony, the family court ordered that the existing judgment for joint physical custody would remain in place, admonishing the parties they needed to ensure Callista spent time with each parent. The court found

The responding officer reported that Callista "stated she was okay and that her mother did not hit her," but Callista "refused to step out of her bedroom during the conversation" with police.

Berquist's RFO did not seek any specific modification of physical custody or the visitation schedule, and the court was not prepared to order Callista to live with Berquist. The court ordered that joint legal custody would remain in place, subject to two modifications: the court awarded sole legal custody "for the purposes of picking a therapist and trying to ensure that [Callista] goes to the therapist" and "for purposes of applying for[,] obtaining[,] and holding the passport." The court set a hearing on Berquist's renewed request for sole custody in March 2022 and appointed minor's counsel for Callista. The court also granted Berquist's request to renew the 2018 DVRO for five years. The court entered separate minute orders on the RFO and the request to renew the DVRO.

Fletcher timely appealed from the order modifying custody.[7]

---

[7] Fletcher's notice of appeal stated he was appealing from an order that "modified an existing custody order and gave partial custody to [Berquist]," and his civil case information statement attached only the minute order on the RFO. Neither submission referred to the family court's separate order renewing the DVRO. Therefore, although Fletcher in his opening brief argues the family court abused its discretion in granting Berquist's motion to renew the DVRO, that order is outside the scope of this appeal. (*Filbin v. Fitzgerald* (2012) 211 Cal.App.4th 154, 173 [""'[W]here several judgments and/or orders occurring close in time are separately appealable . . . , each appealable judgment and order must be expressly specified—in either a single notice of appeal or multiple notices of appeal—in order to be reviewable on appeal."'"].)

9

## DISCUSSION

A.    *Governing Law on Modification of Custody*

"Under California's statutory scheme governing child custody and visitation determinations, the overarching concern is the best interest of the child." (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.) In determining the best interest of the child, the court must consider "all relevant factors, including the child's health, safety, and welfare, any history of abuse by one parent against any child or the other parent, and the nature and amount of the child's contact with the parents." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 955-956.)

"Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement. [Citation.] In recognition of this policy concern, we have articulated a variation on the best interest standard, known as the changed circumstance rule, that the trial court must apply when a parent seeks modification of a final judicial custody determination." (*In re Marriage of Brown & Yana, supra*, 37 Cal.4th at p. 956.) Under the changed circumstance rule, "a party seeking to modify a permanent custody order can do so only if he or she demonstrates a significant change of circumstances justifying a modification. . . . [A court] should preserve the established mode of custody unless some significant change in circumstances indicates that a different arrangement would be in the child's best interest." (*Montenegro v. Diaz, supra*, 26 Cal.4th at p. 256;

see *In re Marriage of McKean* (2019) 41 Cal.App.5th 1083, 1089-1090 [family court's modification of custody order from joint to sole custody was abuse of discretion because of lack of evidence of changed circumstances].)

We apply an abuse of discretion standard to review of custody and visitation orders and review the factual findings as to the child's best interest for substantial evidence. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32; *In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497.) We review questions regarding interpretation of the Family Code de novo. (*Chalmers v. Hirschkop* (2013) 213 Cal.App.4th 289, 300; *Elsenheimer v. Elsenheimer* (2004) 124 Cal.App.4th 1532, 1536.)

B.     *The Trial Court Erred in Denying Fletcher's Request To Cross-examine Berquist*
       1.     *Right to examine parties in family court hearings*
Family Code[8] section 217, subdivision (a), states, "At a hearing on any order to show cause or notice of motion brought pursuant to this code, absent a stipulation of the parties or a finding of good cause . . . , the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties."[9] California Rules of Court, rule 5.113(b) provides that the family

---

[8]     Further statutory references are to the Family Code.

[9]     A "'request for order'" in a family law proceeding has the same meaning as a "'motion'" or "'notice of motion.'" (Cal. Rules of Court, rule 5.92(1)(A); see *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 840, fn. 7 [there was "no question" that section 217 applied to a hearing on a postjudgment request for order to terminate spousal support].)

11

court "must consider" six factors, in addition to the rules of evidence, in making a finding of good cause to refuse to allow live testimony under section 217:  "(1) Whether a substantive matter is at issue—such as child custody, visitation (parenting time), parentage, child support, spousal support, requests for restraining orders, or the characterization, division, or temporary use and control of the property or debt of the parties;  [¶]  (2) Whether material facts are in controversy;  [¶]  (3) Whether live testimony is necessary for the court to assess the credibility of the parties or other witnesses;  [¶]  (4) The right of the parties to question anyone submitting reports or other information to the court;  [¶]  (5) Whether a party offering testimony from a non-party has complied with [section 217, subdivision (c)]; and  [¶]  (6) Any other factor that is just and equitable."  "If the court makes a finding of good cause to exclude live testimony, it must state its reasons on the record or in writing," including "those factors on which the finding of good cause is based."  (Cal. Rules of Court, rule 5.113(c).)

Section 217 was adopted in the wake of *Elkins v. Superior Court* (2007) 41 Cal.4th 1337 (*Elkins*), in which the Supreme Court invalidated a local rule requiring parties in marital dissolution proceedings to present their case by written declarations in lieu of live testimony (other than cross-examination of declarants) because the procedure was inconsistent with the hearsay rule and other fundamental rules of evidence and civil procedure.  (See *In re Marriage of Swain* (2018) 21 Cal.App.5th 830, 838 (*Marriage of Swain*) [tracing the

12

development of section 217 in response to *Elkins*].)[10]  The *Elkins* court emphasized that "a party's opportunity to call witnesses to testify and to proffer admissible evidence is central to having his or her day in court," and "'[s]ubject to such obvious qualifications as the court's power to restrict cumulative and rebuttal evidence [citation], and to exclude unduly prejudicial matter [citation], denial of this fundamental right is almost always considered reversible error.'"  (*Elkins*, at p. 1357.)

In *Marriage of Swain, supra*, 21 Cal.App.5th at page 832, a husband filed a request for order seeking termination of spousal support because he had retired and the wife was receiving a portion of the husband's retirement benefits that roughly equaled the amount of spousal support.  The wife did not oppose the request or appear at the hearing, but she filed an updated income and expense declaration.  (*Id.* at p. 834.)  The husband objected to

---

[10]    The Legislature adopted section 217 in 2010 to implement recommendations made by the Elkins Family Law Task Force, which the Judicial Council established in response to the Supreme Court's suggestion in *Elkins, supra*, 41 Cal.4th at page 1369, footnote 20, that the Judicial Council establish a task force to "study and propose measures to assist trial courts in achieving efficiency and fairness in marital dissolution proceedings and to ensure access to justice for litigants, many of whom are self-represented."  (Judicial Council of Cal., Elkins Family Law Task Force, Final Report and Recommendations (Apr. 2010) p. 9; see Sen. Com. on Judiciary, Analysis of Assem. Bill No. 939 (2009-2010 Reg. Sess.) as amended June 17, 2010, p. 1 ["This bill would make various changes to family law proceedings thereby implementing a number of the legislative recommendations issued by the Elkins Family Law Task Force"]; accord, *Marriage of Swain, supra*, 21 Cal.App.5th at p. 840.)

the court's consideration of the declaration without his ability to cross-examine the wife. (*Id*. at p. 834.) In its statement of decision reducing but not terminating the husband's spousal support obligation, the family court considered the declaration over the husband's objection. (*Id*. at pp. 833-835.) Division Two of this district concluded the court erred in considering the wife's declaration, explaining "the lack of an opportunity to cross-examine the declarant deprives the opposing party of important evidence concerning the credibility of the declarant and the reliability of testimony in the declaration," and absent a stipulation or a finding of good cause to limit live testimony, the proper remedy under section 217 was the exclusion of the wife's declaration. (*Id*. at pp. 841-842.) Because the wife's declaration should have been excluded, there was nothing in the record rebutting the husband's showing of changed circumstances, and on this basis the Court of Appeal reversed the order denying the husband's request to terminate spousal support, and it ordered the spousal support obligation terminated. (*Id*. at pp. 842-844.)

2.     *Denial of Fletcher's request to examine Berquist requires reversal of the order modifying custody*

Early during the November 8, 2021 combined hearing on the RFO and the request to renew the 2018 DVRO, Fletcher called Berquist as a witness. The family court asked Fletcher to make an offer of proof, and Fletcher responded that he wanted to "take [Berquist] through the allegations contained in the DRVO petition to ascertain the basis for the allegations." Later in the hearing the court stated, "You are entitled to cross-examine her." However, after the hearing shifted from the parties' arguments concerning the DVRO to consideration of the RFO, and after Berquist testified about Callista's behavioral changes following

14

the April 10 incident as evidence of parental alienation, Fletcher again requested he be allowed to examine Berquist. Fletcher stated, "I'm asking can I call [Berquist] so we can go through these allegations . . . . Put her under oath, and let's ask her, did you punch your daughter on April [10th]?" The court then asked Berquist (who had already been sworn), "Did you, Ma'am?" Berquist responded, "No." Fletcher asked again, "Can I put her under oath and ask?" The court replied, "No. This isn't—nobody made a request for an evidentiary hearing on the RFO." Despite his continuing objections, the court did not allow Fletcher to cross-examine Berquist.

The family court's ruling preventing Fletcher from questioning Berquist about the RFO was legal error. Berquist submitted two declarations in support of the RFO and testified at the hearing to facts supporting her request for sole custody. Fletcher was entitled under section 217 to present live testimony, including to cross-examine Berquist. (*Marriage of Swain, supra*, 21 Cal.App.5th at p. 842 ["Under section 217, absent a stipulation or a finding of good cause, [husband] had a right to any live testimony that was 'relevant and within the scope of the hearing,'" including "the opportunity to cross-examine [wife] concerning statements in her [d]eclaration on which the trial court might rely."].) The parties here did not stipulate to a waiver of their right to live testimony, and the court did not make a finding of good cause to proceed on Berquist's declarations. Nor can we conclude good cause existed as a matter of law where a substantive matter—child custody—was at issue, and there were material controverted facts and questions of credibility. (Cal. Rules of Court, rule 5.113(b)(1)-(3).)

Section 217 and California rule of court 5.113 do not require, as the family court erroneously found, that Fletcher had

15

to request an evidentiary hearing in order to cross-examine Berquist about her RFO.  (Cf. § 217, subd. (c) ["A party seeking to present live testimony *from witnesses other than the parties* shall, prior to the hearing, file and serve a witness list with a brief description of the anticipated testimony."  (Italics added.)].)  Although some appellate courts have held a party can forfeit the right to cross-examine the opposing party, these cases are inapposite because Berquist was present, sworn, and testified, and Fletcher requested to cross-examine her.  (See *In re Marriage of Binette* (2018) 24 Cal.App.5th 1119, 1128 [under section 217 husband forfeited right to live testimony, explaining "[i]f husband wanted to testify or examine wife, he could have informed the court of his intent to do so.  He did not."]; see also *In re Marriage of Deamon* (2019) 35 Cal.App.5th 476, 483 [where wife failed to secure the presence of ex-husband living abroad by serving a notice to appear in connection with husband's section 281 motion for sanctions, wife "effectively forfeited her right to present live testimony by not providing any live witnesses whose testimony the family court could 'receive' pursuant to requirements of section 217, subdivision (a)"].)

Although the Court of Appeal in *Marriage of Swain, supra*, 21 Cal.App.5th at page 842 concluded the proper remedy for denial of an opportunity to cross-examine a declarant was to exclude the declaration, Fletcher has not requested this remedy in the family court or on appeal.  We therefore reverse the family court's order granting Berquist's RFO and remand for the court to hold an additional evidentiary hearing at which Fletcher and Berquist are allowed an opportunity to cross-examine each other.

The court retains discretion to consider current circumstances in ruling on the RFO.[11]

## DISPOSITION

The November 8, 2021 order modifying custody to award Berquist sole legal custody of Callista for the purposes of obtaining a passport and selecting and seeing a therapist is reversed. The matter is remanded for the family court to hold an additional evidentiary hearing and to allow cross-examination of the opposing party upon request. Fletcher is entitled to his costs on appeal.


FEUER, J.

We concur:


PERLUSS, P. J.


SEGAL, J.

---

[11] Because we reverse the order modifying custody, we do not reach Fletcher's additional contentions other than his argument he was not served with Berquist's RFO and supporting exhibits. Substantial evidence supports the family court's finding Fletcher was served, including the October 5, 2021 minute order continuing the hearing on the RFO, which states Fletcher was served in open court.

17